614 F.2d 301
 Steven John SLOTKIN, an infant by his mother and natural
guardian, Charlotte Slotkin, and Charlotte
Slotkin, as Executrix of the Estate of
Bert Slotkin, deceased, Appellants,
v.
CITIZENS CASUALTY CO. OF NEW YORK, Allstate Insurance Co.,
American MotoristsInsurance Co., American Mutual Insurance
Co. of Boston, Employers MutualLiability Insurance Co. of
Wisconsin, Guaranty Reinsurance Co., Urbaine FireInsurance
Co.,Grange League Insurance Co., National Casualty Co.,
Hardware Mutual CasualtyCo., Arkwright-Boston Manufacturers
Mutual Insurance Co., Paul Ratner, GeorgeBerkowitz,
Christopher McGrath, Jr., and John McGrath, Appellees.
 No. 353, Docket 78-7167.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 17, 1979.
Decided Aug. 29, 1979.
On Rehearing Nov. 27, 1979.
Rehearing and Rehearing En Banc Denied Jan. 31, 1980.
 
 Theodore H. Friedman, Arum, Friedman & Katz, New York City (Fred R. Profeta, Jr., Max Toberoff, New York City, of counsel), for appellants.
 Seymour Lefkowitz, Tell, Cheser, Breitbar & Lefkowitz, New York City (Solomon M. Cheser, New York City, of counsel), for appellee Berkowitz.
 Joseph A. Bergadano, Hart & Hume, New York City (Leslie F. Ruff, New York City, of counsel), for appellees McGrath.
 David W. Silverman, Granik, Silverman, Sandberg & Nowicki, New York City, N.Y., for appellee Citizens Cas. Co. of New York.
 Howard R. Cohen, Bower & Gardner, New York City, for appellee Guaranty Reinsurance Co.
 Kenneth Sagat, D'Amato & Lynch, New York City (John P. Higgins, New York City, of counsel), for appellees Allstate Ins. Co., Urbaine Fire Ins. Co., Arkwright-Boston Manufacturers Mut. Ins. Co., Hardware Mut. Cas. Co., and National Cas. Co.
 Daniel H. Mahoney, New York City (Kathryn D. Nealon, New York City, of counsel), for appellee American Mut. Ins. Co. of Boston.
 Stuart A. Schlesinger, David Jaroslawicz, Julien, Schlesinger & Finz, P.C., New York City, for appellee Ratner.
 Before OAKES, GURFEIN and VAN GRAAFEILAND, Circuit Judges.
 OAKES, Circuit Judge:
 
 
 1
 Any personal injuries lawyer knows that the amount of a defendant's assets or insurance coverage is generally a factor to be weighed in evaluating a case for settlement. The instant diversity action is one for fraud, or its legal equivalent; but it arises from a state court malpractice case that the plaintiffs, a brain-damaged child and his mother,[1] settled on the record after trial commenced for $185,000, just under the so-called "policy limit." Slotkin v. Beth-El Hospital, No. 65-6253 (N.Y.Sup.Ct., Kings County, June 4, 1971) (order approving settlement of March 4, 1971). The Hospital defendant and its primary insurer represented that the policy limit was $200,000 when in fact there was an additional $1 million in excess coverage. Plaintiffs then brought this suit in the United States District Court for the Southern District of New York, Milton Pollack, Judge, under the court's diversity jurisdiction. The jury found certain of the defendant-appellees liable for misrepresenting the insurance coverage. Those defendant-appellees were Citizens Casualty Co. of New York (Citizens), the Hospital's primary insurer; Paul Ratner, Citizens' assistant vice president, who was present at the malpractice trial; Christopher McGrath, Jr., and John McGrath, partners in the firm of McGrath, Cohen & McGrath and nominal trial counsel for the Hospital but actually appearing for the insurers; and George Berkowitz, a Hospital trustee and an attorney. The complaint against the insurance companies that had reinsured Citizens' coverage were dismissed by Judge Pollack in the federal trial. The jury awarded damages in the amount of $680,000, representing the difference between the actual settlement in the state action and a likely settlement amount had there been no misrepresentation of the coverage.[2]
 
 
 2
 Judge Pollack, however, granted judgment notwithstanding the verdict to appellees. Appellees had argued earlier in the proceedings that, as a matter of law, plaintiffs had waived any claim for fraud by affirming the malpractice settlement after discovering the misrepresentations. Judge Constance Baker Motley had denied appellees' motion to dismiss the complaint on this ground, holding that plaintiffs were entitled under New York law to retain the benefits of the settlement and nevertheless to proceed with the fraud action. Slotkin v. Brookdale Hospital Center, 357 F.Supp. 705 (S.D.N.Y.1972).
 
 
 3
 Judge Pollack's original charge to the jury also stated that as a matter of law plaintiffs had not waived their right to sue for fraud. Nevertheless, subsequent to the verdict he reversed his previous holding and also ruled contrary to Judge Motley. He granted judgment to defendants notwithstanding the verdict on the ground that plaintiffs' failure to rescind the settlement and retry the case in state court when given the opportunity to do so constituted a waiver of the fraud action.
 
 
 4
 We reverse this grant of judgment to appellees notwithstanding the verdict except as to appellee Berkowitz. We also reverse the alternative holding that appellees are entitled to a new trial because the jury improperly allocated the damage award after it returned a verdict of liability and in response to a request of the court for clarification of the verdict. Additionally, we reverse the lower court's finding of insufficient evidence to support the verdict against defendant John McGrath and its dismissal of the complaint against the reinsurers of Citizens. Because such a result does not permit a single appropriate judgment our mandate is expressed in the alternative.
 
 I. THE FACTS
 A. Introduction
 
 5
 Appellants here are Steven John Slotkin and his mother, Charlotte Slotkin. Mrs. Slotkin, a diabetic, gave birth to Steven at Brookdale Hospital Center, then Beth-El Hospital, on November 16, 1963. Steven sustained brain damage at birth which his doctors diagnosed as congenital cerebral palsy. As a result of the brain damage, he is paralyzed, confined to a wheelchair, and will require constant care for the rest of his life. Plaintiffs claimed, and the jury in the action below subsequently found, that the Hospital's failure properly to administer insulin to Mrs. Slotkin during the period immediately preceding delivery had caused Steven's brain damage.
 
 B. The State Court Proceedings
 
 6
 In order to understand the issue of waiver, the principal issue that all appellees raise, it is necessary to detail what happened in the state court proceedings. Appellant Steven and his father, Bert Slotkin, since deceased, commenced the state court action against Beth-El Hospital. Citizens had $200,000 of primary liability insurance coverage but was undergoing liquidation and rehabilitation by the State of New York. Ten companies, here called the reinsurers,[3] reinsured $150,000 of this coverage. Subscribing underwriters at Lloyd's of London underwrote $1 million worth of excess insurance.
 
 
 7
 On February 22, 1971, at the jury selection, Christopher McGrath, the attorney for Citizens who was representing the defendant Hospital, told Max Toberoff, plaintiffs' attorney, that the Hospital had only $200,000 worth of insurance coverage. McGrath also stated that he had not told the Hospital's own counsel that the case was on trial, and he refused Toberoff's request that he notify the Hospital's attorney. Toberoff, concerned about the collectibility of plaintiffs' likely judgment, then notified the Hospital administrator by telephone, letter, and telegram that the case was on trial and that the Hospital faced possible exposure to liability for a verdict in excess of $1 million. In response to the Administrator's telephone call, appellee George Berkowitz, an attorney and trustee of the Hospital, appeared at the courthouse on behalf of the Hospital. Berkowitz told Toberoff at that time that the insurance coverage was $200,000. According to Berkowitz's testimony in his deposition taken shortly before the trial below, he had learned about the policy limit from Christopher McGrath, John McGrath, also trial counsel for Citizens, and Paul Ratner, assistant vice-president and claims manager of Citizens.
 
 
 8
 On February 25, 1971, New York State Supreme Court Justice Oliver D. Williams, the trial judge, held a conference for the parties. According to Toberoff's testimony in the court below, both Berkowitz and Christopher McGrath affirmed to the judge that the total insurance coverage was $200,000, although as we have noted, Berkowitz stated that the McGraths and Ratner were the source of his information.[4] Toberoff stated that both he and Justice Williams found it difficult to believe that the Hospital's coverage was so low. Despite the very low "policy limit" and the plaintiffs' willingness to settle within the limit, the parties reached no agreement; and the case went to trial.
 
 
 9
 The state court trial proceeded to plaintiffs' advantage. Dr. Gerald Bernstein, an internist and assistant professor at Albert Einstein College of Medicine and acknowledged specialist in diabetes, testified that Mrs. Slotkin's doctor had ordered fractional urine specimens to be examined for sugar and acetone q.i.d. (four times a day); his orders hence required a test before each meal and at bedtime. Based upon the results of these tests, insulin should have been administered as necessary to avoid acetonuria.[5] Dr. Nicholas Olninc, a neurosurgeon who participated in a National Institutes of Health study introduced at the trial, corroborated Dr. Bernstein's testimony. The health study demonstrated the relationship between acetonuria in diabetic mothers and neuropsychological defects in their children. See note 5 supra. The evidence showed that on the morning of November 14, 1963, two days before Steven's birth, Mrs. Slotkin had acetonuria. This condition was shortlived; she was given regular insulin and responded very readily. By that afternoon the condition had cleared up; her 6:00 p. m. test was also negative. However, she was not given the remaining q.i.d. test before bedtime on the 14th. The following morning she did not feel well; her fractional urine test showed high levels of sugar and acetone, indicating the condition of acetonuria of so much concern. Her own physician administered insulin and made the following note in the hospital record: "Acetonuria noted this a. m. Probably due to the fact that patient has not received any insulin for almost 18 hours." Mrs. Slotkin responded slowly to the insulin, indicating that the acetonuria was quite severe and that she was in a state of acidosis. These episodes were the only acetonuria she had had during her pregnancy.
 
 
 10
 Steven was born on November 16 with symptoms of brain damage; when he was eleven months old and still not sitting up, his parents took him to Dr. Leon Greenspan, director of the Children's Division at the Institute of Rehabilitation Medicine, also known as the Rusk Institute. Dr. Greenspan diagnosed congenital brain damage; at trial he corroborated the testimony of Drs. Bernstein and Olninc that the failure to check Mrs. Slotkin's urine before bedtime on November 14 and to administer the needed insulin had resulted in maternal acidosis which in turn had caused Steven's brain damage.
 
 C. The Settlement
 
 11
 On March 1, 1971, just shortly before the close of plaintiffs' case in the state court and just prior to the time that plaintiffs settled on the basis of the representations of insurance coverage of $200,000, the expert on diabetes for the defense, Dr. Harold Zarowitz, sent appellee Christopher McGrath a letter summarizing their telephone conversation of February 27, 1971. This letter substantiated the negligence of the Hospital and corroborated the opinions of plaintiffs' doctors.[6] The parties held a settlement conference on March 4, 1971, before Justice Williams. At that conference Christopher McGrath again stated on the record that the total insurance coverage, including reinsurance, was $200,000 and that he knew that the Hospital did not have additional insurance with other companies.[7]
 
 
 12
 The parties drafted a stipulation of settlement that was read into the record; the settlement provided in pertinent part:
 
 
 13
 It is further stipulated and agreed that the settlement of $185,000 is hereby approved by the trial judge and that he is to make the allocation of the said sum of $185,000 after all the facts and affidavits are submitted to him by trial counsel as to the allocation of the $185,000 between the plaintiffs Slotkin as to the loss of services and medical expenses and the balance paid to the plaintiff.
 
 
 14
 It is further stipulated that the attorney for the defendant represents that the total insurance coverage of the defendant is the sum of $200,000, under a policy with Citizens Casualty, and to the best of his knowledge there are no other policies covering this event.
 
 
 15
 The settlement in the sum of $185,000 is to be paid without interest, costs or disbursements.
 
 
 16
 MR. TOBEROFF: So stipulated.
 
 
 17
 MR. (Christopher) McGRATH: So stipulated.
 
 
 18
 MR. BERKOWITZ: So stipulated.
 
 D. Uncovering the Misrepresentation
 
 19
 Appellees Christopher McGrath and Berkowitz stipulated that to the best of their knowledge there was only $200,000 worth of coverage. The former, however, had complete access to documents that demonstrated otherwise. In the files of Citizens, there were letters from Robert Gilroy, an attorney with the firm of Mendes & Mount who represented the excess insurer, specifically inquiring about the Slotkin case.[8] The file with the Gilroy letters, which clearly indicated that there was excess coverage, was in the possession of the McGraths' firm during the state court trial. Berkowitz, who was a trustee of the Hospital and vice-chairman of the Legal Committee, did not speak with anyone in the Hospital administration or check any of the Hospital records to determine whether they showed any excess insurance coverage; instead, he stated, he had relied solely upon the statements of Christopher and John McGrath, although Christopher McGrath, of course, maintains that Berkowitz told him what the coverage was. See note 4 supra. Ratner, who took over the settlement negotiations on March 4, contends that the McGraths and Berkowitz had told him that the coverage was only $200,000. But two of the Gilroy letters were specifically directed to Ratner's attention. Indeed, Ratner had briefly spoken with Gilroy regarding the Slotkin case before the trial and saw the letters from Gilroy shortly before the trial.[9]
 
 
 20
 A week to ten days after the parties entered into the stipulation on the record, Ratner advised Christopher McGrath, and Christopher McGrath in turn advised Justice Williams and Toberoff, that there was $1 million in excess coverage and that the representations as to insurance coverage had been erroneous.[10] At this point Justice Williams had not yet signed an order under N.Y.Civ.Prac. Law § 1207 and Rule 1208 (McKinney)[11] allocating the sums paid in settlement. Justice Williams held a conference on March 31, 1971. The judge attempted to have the excess insurer participate in new settlement discussions, but it refused to do so because it claimed that Citizens had not notified it that the case was going to trial (although it did know that an action was pending). Attorneys for the excess insurer did state that it would participate if there were a retrial.
 
 
 21
 Toberoff insisted that it was impossible to retry the case. Mrs. Slotkin, who had testified at trial and whose testimony was important because it contradicted the hospital record in part, had still not recovered completely from a heart attack. Her physician, who examined her shortly after the trial, stated that she should not be asked to testify again. Additionally, all of the plaintiffs' expert witnesses Dr. Bernstein, Dr. Greenspan, Dr. Olninc indicated that they would not testify again. Toberoff contacted a number of other doctors, but they also refused to testify. Moreover, the Slotkins did not have the funds for a new trial. The cost of the plaintiffs' case had been $6,800, and they had borrowed $3,000 to make partial payment.
 
 
 22
 Toberoff also rejected the offer to forfeit the plaintiffs' jury rights and continue the trial before the judge on the original record. He similarly refused the offer of a new jury trial that would rely on the record from the original trial because he believed that having his clients' case put to the jury in the form of a record when the defendants' case would be put in on live testimony would disadvantage plaintiffs' case. Therefore, at the insistence of Toberoff and the plaintiffs, Justice Williams on June 4, 1971, signed the "infant's compromise order," see note 11 supra, approving the settlement. Toberoff's intention to sue all parties involved for fraud was well-known at the time.
 
 E. The Federal Court Suit
 
 23
 Plaintiffs initiated the instant diversity action for fraud, but prior to trial they voluntarily discontinued the case against the Hospital; its administrator and deputy administrator; the excess insurer; its attorney, Robert Gilroy, and his law firm, Mendes & Mount. The case went to trial against the other defendants, who were Citizens, the primary insurer; the reinsurers; Ratner; Berkowitz; and the McGraths. At the close of plaintiffs' case Judge Pollack dismissed the complaint against the reinsurers. The jury found both underlying malpractice on the one hand[12] and fraud on the other; it rendered a verdict in the total sum of $680,000, allocating it in accordance with Judge Pollack's "supplemental instructions"[13] as follows: Citizens, $500,000; Berkowitz, $100,000; Ratner, $60,000; Christopher McGrath, $20,000; and John McGrath, nothing.
 
 
 24
 Subsequent to the verdict Judge Pollack ruled on a reserved motion and dismissed the complaint against John McGrath.[14] He also granted to all appellees judgment notwithstanding the verdict, relying on one proposition and one fact. The proposition was that, because the case concerned a minor, "the settlement stipulation was unenforceable unless it was followed by a judicial order finalizing the arrangement, providing for the distribution of the settlement fund and terminating suit." Slotkin v. Citizens Casualty Co. of New York, 447 F.Supp. 253, 255-56 (S.D.N.Y.1978). The fact upon which Judge Pollack relied was that plaintiffs had learned of the excess insurance before that final order was made and judgment entered so that their "insistence on proceeding with and thereby obtaining the execution of the stipulation of settlement . . . bars this action." Id. at 256. Judge Pollack reasoned that "(i)n the instant case, plaintiffs had not significantly changed position to their prejudice before learning the truth." Id. at 257. He first noted that there was "no impairment of the facts giving rise to claims of malpractice by the hospital"; he then noted that because the plaintiffs had to prove the underlying malpractice even in the fraud action,[15] retrying the malpractice case would have been no more burdensome than pursuing the action for fraud. Id. He held that by obtaining a verdict in the present litigation "plaintiffs have proved that such a retrial was indeed practicable." Id.II. DISCUSSION
 
 A. Judgment Notwithstanding the Verdict
 
 25
 Initially, we note that Judge Pollack had the power to rule as he did on the waiver point, even though Judge Motley (and he) had held otherwise previously. It is well established that "the law of the case" does not constitute a limitation on the court's power but merely expresses the general practice of refusing to reopen what has been decided. Dictograph Products Co. v. Sonotone Corp., 230 F.2d 131, 134-36 (2d Cir.), petition for cert. dismissed per stipulation, 352 U.S. 883, 77 S.Ct. 104, 1 L.Ed.2d 82 (1956). See also Messenger v. Anderson, 225 U.S. 436, 444, 32 S.Ct. 739, 56 L.Ed. 1152 (1912); LeRoy v. Sabena Belgian World Airlines, 344 F.2d 266, 274 (2d Cir.), cert. denied, 382 U.S. 878, 86 S.Ct. 161, 15 L.Ed.2d 119 (1965).
 
 
 26
 As a matter of law, however, we agree with Judge Motley's ruling. As she said, it was the settlement stipulation entered into before the plaintiffs knew of the excess coverage that was the contract induced by appellees' misrepresentations; and as a result of the stipulation plaintiffs terminated the state court jury trial without a verdict. 357 F.Supp. at 707. The law of New York is clear that one who has been induced by fraudulent misrepresentation to settle a claim may recover damages without rescinding the settlement. Strong v. Strong, 102 N.Y. 69, 73, 5 N.E. 799, 800 (1886); Byrnes v. National Union Insurance Co., 34 A.D.2d 872, 310 N.Y.S.2d 781 (1970); Inman v. Merchants Mutual Casualty Co., 274 A.D. 320, 323-24, 83 N.Y.S.2d 801, 804 (1948).[16]
 
 
 27
 Even if the underlying premises of this New York rule allowing rescission on the one hand or ratification and suit for damages on the other were unsound, we would of course nevertheless be bound by that rule. The premises for the rule, however, are quite sound. If all that will result from a misrepresentation is a new trial, then the party making it has everything to gain and nothing to lose. The plaintiffs would be placed at a disadvantage by a new trial; the defendants would not. If anything, defendants would benefit by having a preview of plaintiffs' case. As McCormick notes in the case of willful fraud:
 
 
 28
 (I)f the defendant by willful falsehood has cozened the plaintiff into risking his property upon a bargain, which, upon the information given by the defendant, would have been profitable, a remedy which merely seeks to place the plaintiff back in the position he was in before seems hardly adequate. The plaintiff might well be given the value of the expected bargain. A willful fraud should cost as much as a broken promise. If the cheat can anticipate that the worst that can happen is that he shall be called upon to pay back his profit upon the trade, he may be encouraged to defraud.[17]
 
 
 29
 C. McCormick, Handbook on the Law of Damages § 121, at 453 (1935). Thus the New York rule serves to deter fraud. Moreover, the rule does not present a problem of double recovery. In this case, for example, Judge Pollack appropriately instructed the jury that in fixing damages it should deduct from the "fair settlement value" the $185,000 received under the settlement. See note 2 supra.
 
 
 30
 Judge Pollack considered that the settlement was "inchoate" until the judicial order finalizing the arrangement was made. He relied heavily on this characterization in determining that defendants' misrepresentations had not prejudiced plaintiffs. But even if the March 4, 1971, stipulation of settlement was technically "inchoate,"[18] it was treated as final at the time; and plaintiffs reasonably relied upon defendants' representations in agreeing to the settlement and allowing the judge to dismiss the jury. Thus although it is true that plaintiffs could have avoided going through with the settlement, this does not diminish the prejudice that they had already suffered by irrevocably changing their position.
 
 
 31
 In holding that plaintiffs had waived their right to sue by not rescinding the settlement, Judge Pollack relied upon a series of commercial cases which he cited for the proposition that "(i)f a victim of misrepresentation learns the truth when performance of a contract has just begun, and he could rescind without significant prejudice, . . . he waives the fraud if he proceeds to execute the agreement." 447 F.Supp. at 256, citing, e. g., A. G. Concrete Breakers, Inc. v. State, 9 A.D.2d 995, 996, 194 N.Y.S.2d 743, 745 (1959) (alternative ground); Kelly v. Otis Elevator Co., 283 A.D. 363, 368, 128 N.Y.S.2d 39, 43 (1954) (dictum), aff'd mem., 308 N.Y. 805, 125 N.E.2d 864 (1955). This rule prevents a plaintiff from recovering damages for "self inflicted" injury. See, e. g., Thompson v. Libby, 36 Minn. 287, 31 N.W. 52, 53 (1886). But these cases are distinguishable because they all involve an exchange of money or value for goods or services after the defrauded party has learned of the fraud and when he has not incurred any damages at the time that he has the opportunity to rescind.
 
 
 32
 Involved here, however, is the release or settlement of an underlying personal injury claim where, in contrast to the commercial cases, the plaintiffs had already been injured by the dismissal of the jury before they discovered the fraud. Plaintiffs here never had the opportunity to avoid any injury. Plaintiffs were already injured, and their only choices were to accept the settlement and sue for fraud or to retry the malpractice case with all that retrial involved in terms of obtaining witnesses and the like. Given these choices, their decision to proceed by way of the fraud action was understandable, as we discuss below.
 
 
 33
 The true measure of damages was as Judge Pollack charged initially: the difference in settlement value before and after discovery of the fraud, note 2 supra. We note that there is no problem here of plaintiffs' failure to mitigate damages by this suit rather than electing to retry the malpractice action. It is true that on retrial the exposure of appellees would have been less because the excess insurer would have been in the case. Nevertheless, plaintiffs were not obliged to incur the risks that retrial would have presented. At retrial, so far as then appeared, plaintiffs would stand a chance of receiving a verdict smaller than the original settlement amount or possibly losing everything in a verdict for the defendants. This risk was additional prejudice to them if they proceeded by retrial because they had already eliminated this risk from the first trial by settling. Having passed the point in the first trial where they could have received nothing or less than $185,000, they should not be required to face this risk again in a second malpractice trial. The law of damages is clear:
 
 
 34
 If the effort, risk, sacrifice, or expense which the person wronged must incur in order to avoid or minimize a loss or injury is such that under all the circumstances a reasonable man might well decline to incur it, a failure to do so imposes no disability against recovering full damages.
 
 
 35
 C. McCormick, supra, § 35.
 
 
 36
 Of course by hindsight it may appear that the risk of a defendant's verdict was minimal, but that is by hindsight only. At the time that plaintiffs had to make their election there was a definite possibility that no live medical evidence could be had for a retrial.
 
 
 37
 We stress again that it was appellees who committed the fraud, that plaintiffs did significantly change position by allowing the judge to dismiss the jury before learning the truth, and that obtaining a verdict in the present litigation under more favorable circumstances does not at all show that a retrial in the state court would not have resulted in still further injury to plaintiffs.[19] Thus Judge Pollack was in error in granting judgment notwithstanding the verdict on the ground that plaintiffs had not significantly changed their position before learning the truth.
 
 B. The Liability of the Parties
 
 38
 Because we believe that the jury could properly have found, as it did under appropriate instructions, supra note 19, that fraudulent misrepresentations made to plaintiffs amounted to legal fraud, and that they did not waive their right to sue for the injury that they suffered as a result of those representations, we address the remaining principal question on appeal of who was responsible and who is therefore liable.
 
 1. Christopher McGrath
 
 39
 We believe that the jury could properly find that Christopher McGrath's conduct rendered him liable under New York law as charged. McGrath was in charge of the settlement negotiations until Ratner took over; all the while McGrath's position of authority heightened the impact of his representations as to the insurance coverage. McGrath stipulated that "to the best of his knowledge" there was only $200,000 worth of coverage in spite of the information in the documents in his possession. See note 8 supra. McGrath's insistence that the policy limit was $200,000, see note 7 supra, renders him liable under the New York definition of scienter as "a reckless indifference to error," "a pretense of exact knowledge," or "(an) assertion of a false material fact 'susceptible of accurate knowledge' but stated to be true on the personal knowledge of the representer." See Burgundy Basin Inn v. Watkins Glen Grand Prix, 51 A.D.2d 140, 379 N.Y.S.2d 873, 879 (1976), and cases cited. This, of course, attunes with the classic formulation of Judge Cardozo in the touchstone case of Ultramares Corp. v. Touche, Niven & Co., 255 N.Y. 170, 174 N.E. 441, 449-50 (1931).[20]
 
 2. Paul Ratner
 
 40
 Ratner took over the settlement negotiations on March 4; and again, his position of authority in and of itself made his misstatements more egregious. Ratner contends that the McGraths and Berkowitz[21] told him that the coverage was only $200,000; but again, the documents are evidence against him. See note 9 supra. The letters then in his possession explicitly disclose the excess insurance; and there was ample evidence, to permit the jury to reject any defense of failure of memory or simple mistake on his part, note 10 supra, and, as in the case of Christopher McGrath, to find scienter under Burgundy Basin and Ultramares, supra.
 
 3. George Berkowitz
 
 41
 The jury's finding as to Berkowitz is more troubling. Berkowitz did not speak with anyone in the Hospital administration nor check any of the Hospital records to determine the insurance coverage, instead relying solely upon the statements of Christopher and John McGrath. We could easily hold that Berkowitz was negligent, perhaps even grossly negligent, in so failing to check or in so relying; but there is, we think, insufficient evidence to permit a jury to find recklessness or a representation "stated to be true on the personal knowledge of the representer."
 
 
 42
 Indeed, we note that plaintiffs in fact did not premise their action against Berkowitz on the theory that he had intentionally or even recklessly misrepresented the amount of the insurance coverage. Both Charlotte Slotkin and Toberoff testified that they did not believe that Berkowitz had lied. Rather, Mrs. Slotkin stated that "he just didn't know any better about any of the insurance companies"; and Toberoff stated that "it was my impression that George Berkowitz may have been guilty of a fraudulent representation in that he was grossly careless." Furthermore, plaintiffs do not make a claim against Berkowitz for a representation of absolute knowledge. Their reference to the record discloses, insofar as Berkowitz is concerned, only the testimony on deposition by Berkowitz that he told Toberoff after conversing with the McGraths that he "was informed that there was $200,000 insurance."
 
 
 43
 Finally, we note that Berkowitz not only had no motive to conceal the excess insurance; but rather, to protect the Hospital, he had every reason to seek to tap whatever insurance coverage there might have been. His unawareness of the excess insurance is evident in his statement to Justice Williams that because he believed that the Hospital itself would be liable above the $200,000 limit, he wanted the record to reflect bad faith on the part of the insurance carrier if it failed to settle the case within the $200,000 limit. The district court itself noted the "extraordinarily thin reed on which it is suggested that there may be a claim against" Berkowitz, and we hold that the court did not err in recognizing this lack of evidence in granting Berkowitz's motion for judgment notwithstanding the verdict.
 
 4. Dismissal of John McGrath
 
 44
 The court should not, however, have dismissed the complaint as to John McGrath.[22] Although he may have been only minimally at fault, there was sufficient evidence for the case against him to go to the jury; and the jury found him liable (even though in subsequently apportioning the damages it allocated none to him). As to John McGrath the verdict was not against the weight of credible evidence. There was evidence that John McGrath gave the appearance of personal knowledge when he specifically ratified his brother's misrepresentation: "What Chris told you is true . . . . All the coverage there is on the case is $200,000 . . . . That's it. How many times do you want to hear it?" Berkowitz stated that John McGrath was one of his sources of information about the insurance coverage. There was evidence that John McGrath participated in the drafting of the March 4 stipulation which contained explicit representations as to the coverage limit. Moreover, the letters from the excess insurer's counsel were in his firm's file. We note that on the basis of this evidence, Judge Pollack reversed his earlier ruling granting John McGrath's motion for dismissal. On the renewed motion at the close of all the evidence, Judge Pollack recognized that it would be best to get the jury's verdict on the fact questions. The evidence supports the verdict that the jury rendered, and it is in accordance with New York law under Burgundy Basin and Ultramares, supra.
 
 
 45
 Finally, even though the case was not tried on a partnership theory, as a matter of law John McGrath was liable for his partner's tort. N.Y. Partnership Law §§ 24, 26 (McKinney); Caplan v. Caplan, 268 N.Y. 445, 448, 198 N.E. 23, 24 (1935); see also Pedersen v. Manitowoc Co., 25 N.Y.2d 412, 419, 306 N.Y.S.2d 903, 909, 255 N.E.2d 146, 150 (1969) (joint venture).
 
 5. Dismissal of the Reinsurers
 
 46
 The reinsurers were closely involved in all the transactions leading up to the settlement. They had written notice of the state court trial, and they had an absolute right to all information concerning any matter affecting their coverage. Moreover, their consent was needed for any settlement within the reinsured range, i. e., over $50,000. There was abundant evidence, including Ratner's own testimony, that throughout the trial Ratner communicated with each of them either directly or through his subordinate. Ratner told Toberoff that he had to telephone the reinsurers as soon as the settlement talk crossed the $50,000 line. Indeed, Toberoff provided Ratner with a copy of the National Institutes of Health study better to enable Ratner to persuade the reinsurers to settle. Ratner testified that he contacted each of the reinsurers to obtain their final consent to the $185,000 settlement. And according to Toberoff's testimony in the court below, Berkowitz told him at the time of the settlement negotiations that Ratner was talking to the reinsurers; Christopher McGrath confirmed that Ratner told him that he, Ratner, had obtained the reinsurers' consent to the settlement.
 
 
 47
 For the reinsurers to be liable for misrepresentation, plaintiffs needed to prove that Ratner was acting as their agent or representative when he misrepresented the amount of coverage. A crucial point to remember is that although the reinsurers' consent was required for any settlement above $50,000, they did not have an employee present at the trial. Because a settlement stipulation was agreed upon, one can infer that the reinsurers' consent to the settlement was obtained through some intermediary, some agent. The reinsurers contend that Ratner's testimony was inadmissible against them to prove agency and thus that there was a complete absence of probative evidence of an agency relationship.
 
 
 48
 In dismissing the complaint against the reinsurers, Judge Pollack relied on the rule of law that he paraphrased as "(a)cts and declarations of a person assuming to be the representative of another are not competent to prove the agency." Compare Restatement (Second) of Agency § 285 (1958). That rule, however, does not deal with testimony by an agent. See id. comment a. As there stated, "(a) person can properly testify as to the facts which it is alleged constitute his authority, and his testimony can be introduced either by or against the alleged principal." See F. Mechem, Outlines of the Law of Agency § 95 (P. Mechem ed. 1952). See also Steuerwald v. Jackson, 123 A.D. 569, 108 N.Y.S. 41 (1908); Boston Old Colony Insurance Co. v. Trivedi, 93 Misc.2d 566, 403 N.Y.S.2d 169 (1978). Thus Ratner's testimony was admissible on the issue of agency. The reinsurers themselves concede in their brief that "(t)he deposition testimony of Mr. Ratner . . . is not prohibited by the rule regarding the out of court acts and declarations of a purported agent." Rather, their argument is that Ratner's statements do not prove the existence of agency. We agree with plaintiffs that their burden of proof to avoid dismissal of the complaint was not to prove the agency but merely to adduce sufficient evidence to take the issue to the jury. The jury should have been allowed to resolve the fact questions, as is its province.
 
 
 49
 This is not to say that Ratner's misrepresentations as to excess coverage were within the scope of his agency. This too is a question of fact that the fact-finder must decide. The rule in this regard is that "(i)f the statement is one which, if true, the agent would be authorized or apparently authorized to make, the principal is subject to liability for it, although deceitfully made." Restatement (Second) of Agency, supra, § 257, comment a.[23] We note, however, that the jury's verdict indicates a finding that Ratner's comments were made within the scope of his agency with Citizens. We believe that there is also sufficient evidence for a jury to conclude that if Ratner was acting as agent for the reinsurers, his comments were similarly within the scope of his agency. The evidence could support a finding that Ratner's agency relationship with Citizens and with the reinsurers was the same; if so we can see no difference in the fact of liability of the two as principals.
 
 
 50
 We note further on the issue of the sufficiency of the evidence that on the basis of Ratner's declarations, we must reject the reinsurers' contention that the Restatement rule prohibiting out of court declarations renders "inadmissible and substantively incompetent" on the issue of agency the testimony of Toberoff, Berkowitz, and Christopher McGrath. Section 285 provides that:
 
 
 51
 Evidence of a statement by an agent concerning the existence of extent of his authority is not admissible against the principal to prove its existence or extent, unless it appears by other evidence that the making of such statement was within the authority of the agent or, as to persons dealing with the agent, within the apparent authority or other power of the agent.
 
 
 52
 Thus if the jury finds that Ratner's declarations establish the agency and the scope of his authority as encompassing his statements, then it may properly consider the testimony of others as well. Thus on the basis of all of the testimony, there was sufficient evidence of an agency relationship to send the case against the reinsurers to the jury.
 
 C. Allocation of Damages
 
 53
 Appellees argue that in any event a new trial is called for because of the jury's allocation of damages. The jury first brought in a verdict of $680,000 "total against all of them." See note 13 supra. In response to a question by the court, "Has the jury found that each of the defendants is liable for the $680,000?," the forelady said, "Yes, Your Honor." At this point, the court raised the spectre of multiple liability against the defendants in the amount of $680,000 each and sent the jury out to determine whether it wanted to allocate the verdict. Id. The jury returned the second time with the allocated verdict as noted above.
 
 
 54
 Judge Pollack's subsequent comments and actions amounted to an instruction to the jury to determine contribution rights under Dole v. Dow Chemical Co., 30 N.Y.2d 143, 331 N.Y.S.2d 382, 282 N.E.2d 288 (1972), something that has no bearing upon the joint and several liability to the plaintiffs of the defendants found liable. Kelly v. Long Island Lighting Co., 31 N.Y.2d 25, 334 N.Y.S.2d 851, 286 N.E.2d 241 (1972). In his written opinion, Judge Pollack correctly concluded that although the allocated verdict was in accordance with his instruction, it was erroneous as a matter of law because liability for the whole harm was joint and several. 447 F.Supp. at 257-58.[24]
 
 
 55
 Thus the crucial question is whether the subsequent submission to the jury can be treated as void, allowing plaintiffs to reinstate the $680,000 verdict. We find that under Klepper v. Seymour House Corp., 246 N.Y. 85, 98-99, 158 N.E. 29, 34 (1927), the jury properly found a general verdict in accordance with the law; their subsequent action of allocation under direction of the court is surplusage which may be disregarded. See also Dextone Co. v. Building Trades Council, 60 F.2d 47, 49 (2d Cir. 1932) (where jury verdict, which attempted to apportion damages, had found both liability and amount of plaintiff's loss, form of verdict may be disregarded); Gleich v. Volpe, 32 N.Y.2d 517, 523-24, 346 N.Y.S.2d 806, 811, 300 N.E.2d 148, 151-52 (1953) (trial judge properly disregarded jury's attempt to apportion damages between defendants and entered judgment against both defendants for full amount awarded plaintiffs). We hold that the $680,000 verdict against Citizens, Ratner, and both McGraths, jointly and severally, may be reinstated.
 
 
 56
 Because we have also held that the court below should not have dismissed the complaint against the reinsurers, plaintiffs have an option: they may either reinstate the verdict and judgment of $680,000 against Citizens and the three individuals, or they may retry the case ab initio against all appellees except George Berkowitz on both liability and damages. They may not do both. If plaintiffs elect reinstatement of the verdict already rendered, the case will be remanded for a separate trial before Judge Pollack on the cross claims for contribution and apportionment among the appellees (against except George Berkowitz) as per their stipulation, note 24 supra.
 
 
 57
 Judgment in accordance with opinion.
 
 VAN GRAAFEILAND, Circuit Judge, dissenting:
 
 58
 In February 1971, a medical malpractice action against Brookdale Hospital was reached for trial in New York State Supreme Court. The suit had been brought on behalf of Steven Slotkin, an infant, who allegedly sustained permanent brain damage at the time of his birth because of the improperly controlled toxemia of his diabetic mother.
 
 
 59
 The hospital had $1,200,000 of liability insurance, $200,000 of primary coverage written by Citizens Casualty Co. and a $1,000,000 umbrella policy written by Lloyds of London. The hospital's attorneys had nothing to gain by hiding from plaintiffs the existence of the umbrella policy. The insurance was there to be used; that is why the hospital purchased it.[1] If the attorneys fraudulently concealed its existence, they exposed themselves to personal liability which might not be covered by their own malpractice policy.[2] They would be liable to the plaintiffs and would also be required to indemnify all of the hospital's carriers held derivatively liable because of their wrongdoing. Oceanic Steam Navigation Co. v. Compania Transatlantica Espanola, 134 N.Y. 461, 467, 31 N.E. 987 (1892); Opper v. Tripp Lake Estates, Inc., 274 App.Div. 422, 423-24, 84 N.Y.S.2d 461 (1948), aff'd, 300 N.Y. 572, 89 N.E.2d 527 (1949); 42 C.J.S. Indemnity § 21 at 597-98.
 
 
 60
 Notwithstanding the foregoing, the existence of the Lloyds policy was not disclosed, and, as a result, the attorneys and claim representative Ratner have been sued for fraud and misrepresentation. Although the personal liability to which these men are thus exposed is in no way determinative of the issues on this appeal, it precludes us from comfortably rationalizing that this litigation involves merely the shifting of liability from one insurance carrier to another. It also highlights what I believe to be the basic weakness in plaintiffs' case.
 
 
 61
 The fundamental issue on this appeal is whether plaintiffs could reject Lloyds' offer to make $1,000,000 in coverage available if the trial were recommenced, successfully importune the state judge to approve settlement for $185,000, and thereafter recover substantial damages from appellees because the settlement approved at plaintiff's insistence did not represent their claim's true settlement value. I believe that the district court was correct in concluding that they could not.
 
 
 62
 I disagree at the outset with the majority's interpretation of the New York law governing infants' settlements. Prior to court approval, the settlement herein was not, as the majority would have it, only "technically" inchoate. Until the compromise was approved by the court in the manner prescribed by the New York statutes, it was not a legal settlement, and it could not be enforced by either the plaintiffs or the defendants.
 
 
 63
 Two former New York State Supreme Court Justices, one of whom is now a Judge of the New York Court of Appeals, testified as experts on the trial below. They were in agreement that Judge Williams could have, and should have, declined to sign the order approving the $185,000 settlement, in which event the stipulation of compromise would have had no binding effect. Plaintiffs' trial counsel in the state court action also testified that "Judge Williams had a right to refuse to sign the compromise papers, which would have nullified the entire settlement proceedings" and that "if he didn't sign the papers I did know that the settlement is a nullity." These were correct statements of the New York law.
 
 
 64
 Infant plaintiffs are wards of the court, Glogowski v. Rapson, 20 Misc.2d 96, 97, 198 N.Y.S.2d 87 (1959), and New York's "rules of practice abound in provisions of ancient origin designed to safeguard their legal rights." Greenburg v. New York Central and H. R. R. R. Co., 210 N.Y. 505, 509, 104 N.E. 931, 932 (1914). Today's rules, as embodied in CPLR 1207 and 1208, require that applications for approval of an infant settlement be made upon motion supported by affidavits of the infant's representative and attorney setting forth certain specified facts.[3] The order entered on such a motion has the effect of a judgment. CPLR 1207; Krichmar v. Krichmar, 42 N.Y.2d 858, 860, 397 N.Y.S.2d 775, 366 N.E.2d 863 (1977).
 
 
 65
 Until the requirements of CPLR 1207 and 1208 are complied with, there can be no binding compromise agreement. Ferraro v. Stripekis, 60 A.D.2d 861, 401 N.Y.S.2d 252 (1978); Caglioti v. Medi-Cab, Inc., 52 A.D.2d 544, 382 N.Y.S.2d 311 (1976); Valdimer v. Mount Vernon Hebrew Camps, Inc., 9 A.D.2d 900, 195 N.Y.S.2d 24, aff'd, 9 N.Y.2d 21, 210 N.Y.S.2d 520, 172 N.E.2d 283 (1961); 28 N.Y.Jur. Infants § 63. Any compromise reached in anticipation of a court-approved settlement is unenforceable, because the statutes prescribe the only method by which a defendant may secure a binding release from an infant. 2 Weinstein, Korn & Miller, New York Practice § 1207.06.[4]
 
 
 66
 It is undisputed that plaintiffs had full knowledge of the amount of Brookdale's insurance coverage some three months before they succeeded in securing court approval. It is also undisputed that plaintiffs importuned Judge Williams to approve the $185,000 settlement in order that they might bring suit against appellees for fraud. In so doing, they completely removed from the case one of the requisite elements for a claim in fraud, i. e., reliance. To recover for misrepresentation, a plaintiff must establish that he relied upon the misrepresentation and that the damages for which recovery is sought flowed from the reliance. Ochs v. Woods, 221 N.Y. 335, 338, 340-41, 117 N.E. 305 (1917); Karscher v. Dewald, 246 App.Div. 21, 22-23, 284 N.Y.S. 213 (1935); 24 N.Y.Jur. Fraud and Deceit § 25 at 224.[5]
 
 
 67
 Contrary to Judge Oakes' assertion, the damages which are the basis of plaintiffs' claim for recovery did not occur at the time the state action was discontinued and the jury dismissed. Although plaintiffs did agree to a discontinuance in reliance upon appellees' misstatements, and, as a result, undoubtedly sustained some damage, this was not the damage for which they sued. The jury's verdict was based upon the allegedly inadequate settlement which plaintiffs insisted the Court approve after they had full knowledge of the facts. Under the doctrine of volenti non fit injuria, recovery cannot be had where an agreement has been consummated in this manner. Oleet v. Pennsylvania Exchange Bank, 285 App.Div. 411, 137 N.Y.S.2d 779 (1955); Kelly v. Otis Elevator Co., 283 App.Div. 363, 128 N.Y.S.2d 39 (1954), aff'd, 308 N.Y. 805, 125 N.E.2d 864 (1955); General Valuations Co. v. City of Niagara Falls, 253 App.Div. 156, 1 N.Y.S.2d 880, aff'd on this point, 278 N.Y. 273, 15 N.E.2d 802 (1938); Commodity Credit Corp. v. Rosenberg Bros. & Co., 243 F.2d 504 (9th Cir.), cert. denied, 355 U.S. 837, 78 S.Ct. 62, 2 L.Ed.2d 48 (1957).
 
 
 68
 The rationale of the foregoing cases is not confined to commercial contracts. The proper measure of damages is inseparably connected with the right of action, Chesapeake & Ohio Ry. v. Kelly, 241 U.S. 485, 491, 36 S.Ct. 630, 60 L.Ed. 1117 (1915), and two basic and closely related doctrines of the law of damages are (1) that a wrongdoer is responsible only for the natural and proximate consequences of his misconduct, Steitz v. Gifford, 280 N.Y. 15, 20, 19 N.E.2d 661 (1939), and (2) that an injured person must take reasonable steps to minimize his losses. Pearlstein v. Scudder & German, 527 F.2d 1141, 1145 (2d Cir. 1975); Industrial Sugars, Inc. v. Standard Accident Insurance Co., 338 F.2d 673, 676 (7th Cir. 1964). Under the doctrine of "avoidable consequences", a plaintiff cannot recover damages resulting from consequences he could reasonably have avoided. Restatement of Torts § 918. Put another way, if a plaintiff could reasonably have avoided the consequences, the defendant's wrongdoing is not the proximate cause of their occurrence. McClelland v. Climax Hosiery Mills, 252 N.Y. 347, 358-59, 169 N.E. 605 (1930) (Cardozo, C. J., concurring); W. B. Moses & Sons v. Lockwood, 54 App.D.C. 115, 295 F. 936, 941 (D.C. Cir. 1924).
 
 
 69
 Here, the plaintiffs deliberately and knowingly rejected $1,000,000 in available insurance in order that they might impose liability upon appellees. In view of this conduct, I am at a loss to understand the majority's statement that "(p)laintiff's here never had the opportunity to avoid any injury." Plaintiffs had every opportunity to avoid the injury for which they now seek recovery. It is no answer to say that, if they wanted to take advantage of Lloyds' umbrella policy, they would have to present their proof a second time. They would have to do this in any event in their fraud action against appellees.[6] It is likewise no answer to say that plaintiffs would have to rescind their settlement and give up $185,000. Until court approval was obtained, plaintiffs had no binding settlement, no $185,000, and no right to demand payment of it. Moreover, there is nothing in the record to indicate that appellee insurers would have withdrawn their settlement offer if the case were ordered retried. Indeed, because appellees' entire $200,000 would have to be expended before the $1,000,000 in umbrella coverage became available, appellees would almost certainly have offered the full amount of their policies in order that plaintiffs would not be denied the benefit of the umbrella coverage.
 
 
 70
 "To err is human" is a phrase inscribed in the records of antiquity. Where, as here, defendants have erred, the law does not impose upon plaintiffs the divine obligation of forgiveness. Justice will not be served, however, if this Court accepts financially motivated retaliation as an alternative. Because I believe this is what my colleagues are doing in the instant case, I respectfully dissent.
 
 
 71
 Assuming, for the argument only, that the district judge erred in dismissing the complaint as to the individual defendants, he was nonetheless correct in dismissing as against the reinsurers. The sole obligation of the seven reinsurers was the contractual duty to indemnify Citizens Casualty Co. for the amount of its policy loss in excess of $50,000, the share of reinsurance as between carriers varying from five percent to fifteen percent. Although settlement of plaintiffs' case for $185,000 resulted in a saving for the five percent reinsurer of only $750, my colleagues hold nonetheless that a jury could find that Ratner was acting as this carrier's agent when he fraudulently concealed the existence of Lloyds $1,000,000 policy. They say that the "evidence could support a finding that Ratner's agency relationship with Citizens and with the reinsurers was the same." With all due respect for my brothers' perspicacity, I do not find this to be so.
 
 
 72
 Ratner was a paid employee of Citizens, the company whose policy was issued to Brookdale and whose duty it was to handle all liability claims against the hospital. The reinsurers' sole obligation was to Citizens, i. e., the obligation to indemnify. Greenman v. General Reinsurance Corp., 237 App.Div. 648, 649, 262 N.Y.S. 569 (1933).
 
 
 73
 "Reinsurance, to an insurance lawyer, means one thing only the ceding by one insurance company to another of all or a portion of its risk for a stipulated portion of the premium, in which the liability of the reinsurer is solely to the reinsured which is the ceding company, and in which contract the ceding company retains all contact with the original insured, and handles all matters prior to and subsequent to loss."
 
 
 74
 13 Appleman, Insurance Law and Practice § 7681 at 479-80.
 
 
 75
 Giving plaintiffs the benefit of the broadest reading of all the testimony concerning the in-court and out-of-court statements of Ratner,[7] his sole contact with the reinsurers was through telephone conversations with their "claims people" in which either he or his subordinates at Citizens attempted to "sell them", to "push them", to "get them to up the offer". This, my brothers say, is sufficient to permit a finding that Ratner was acting as the agent for all seven "pushees".[8] I disagree.
 
 
 76
 Agency is a fiduciary relationship which arises when one acts on behalf of another and is subject to his control. Northern v. McGraw-Edison Co., 542 F.2d 1336, 1343 (8th Cir. 1976), cert. denied, 429 U.S. 1097, 97 S.Ct. 1115, 51 L.Ed.2d 544 (1977); Aetna Insurance Co. v. Glens Falls Insurance Co., 453 F.2d 687, 690-91 (5th Cir. 1972); Globemaster Midwest, Inc. v. United States, 337 F.Supp. 465, 470 (Cust.Ct.1971); Restatement (Second) of Agency § 1. The purported agent must have been assigned and instructed by the purported principal to carry out the task he was performing. Paroutian v. United States, 370 F.2d 631, 632 (2d Cir.), cert. denied, 387 U.S. 943, 87 S.Ct. 2077, 18 L.Ed.2d 1331 (1967).
 
 
 77
 There is not one iota of evidence to establish that Ratner, the Assistant Vice President of Citizens, was under the control and supervision of the reinsurers.[9] He denied categorically that he was or that he acted on their behalf. Moreover, the testimony that Ratner attempted to "sell" and "push" these companies, the only testimony offered to establish agency, is completely at odds with the fiduciary obligation that Ratner, as an agent, would owe.
 
 
 78
 In today's world of high verdicts, where substantial insurance coverage is a must, it is rare indeed that the entire risk on a policy is carried by the named insurer. Reinsurance is the rule rather than the exception. Under my colleagues' version of the law, a reinsuring carrier would not dare discuss settlement of a case with the primary carrier's claim representative for fear that it would be making him its agent. This is not, and should not be, the law. See Aetna Insurance Co. v. Glens Falls Insurance Co., supra, 453 F.2d at 690-91. Where, as here, plaintiffs failed completely to establish the existence of a principal-agent relationship, the district court had no alternative but to dismiss the complaint as to the reinsuring carriers. Cramer v. Hoffman, 390 F.2d 19, 23 (2d Cir. 1968); Hedeman v. Fairbanks, Morse and Co., 286 N.Y. 240, 248, 36 N.E.2d 129 (1941).
 
 CONCLUSION
 
 79
 In dismissing the infant's claim against the reinsurers and in setting aside the verdict against the remaining defendants, Judge Pollack was performing a most unpleasant task. He was, however, carrying out his duties in accordance with the highest traditions of his office. I have written at some length in a losing cause because I want to make clear that, in the opinion of one appellate judge, the law of New York gave Judge Pollack no happier choice.
 
 
 80
 I would affirm.
 
 ORDER AND OPINION ON PETITIONS FOR REHEARING
 
 81
 On petitions for rehearing by the reinsurers, Allstate Insurance Co., American Motorists Insurance Co., American Mutual Insurance Co. of Boston, Employers Mutual Liability Insurance Co. of Wisconsin, Guaranty Reinsurance Co., Urbaine Fire Insurance Co., Grange League Insurance Co., National Casualty Co., Hardware Mutual Casualty Co., and Arkwright-Boston Manufacturers Mutual Insurance Co. The petitions for rehearing by the reinsurers, in addition to making the same argument made in their main briefs, argue that not to dismiss the case would have "serious consequences for the entire insurance industry" (Petition for Guaranty Reinsurance Co. at 5); "Now, reinsurers will be held directly liable as principals of the reinsured to third parties" (Petition for American Mutual Insurance Co. of Boston at 4); and that "the decisions of the New York Courts have uniformly followed a rule of strict privity to even the extent that insureds of the direct insurer do not generally have an action against reinsurers" (Petition for other reinsurers at 3-4).
 
 
 82
 Our decision, however, in no way seeks to, or operates to, impinge upon the doctrine of privity usually prevalent in reinsurance matters. We have held only on the particular facts involved in this case and on the record we had before us that there was sufficient evidence to take the case to the jury on the question whether, in negotiating the settlement with the Slotkins, Ratner was acting as agent for the reinsurers and whether his comments misrepresenting the scope of the insurance coverage in the course of those negotiations were within the scope of his agency. At 317.[1]
 
 
 83
 If plaintiffs exercise their option under our opinion to "retry the case ab initio against all appellees except George Berkowitz on both liability and damages," at 318, an option which they may not elect to take, and plaintiffs on a retrial meet their burden of proof to take the issue of agency to the jury, it will of course be open to the reinsurers to adduce contrary proof on the existence of the agency relationship or whether Ratner's misrepresentations as to excess coverage were within the scope of his agency for them. Similarly the factual issue whether Ratner contacted the reinsurers to obtain their consent to the $185,000 settlement,[2] to the extent it has a bearing on those issues and the case, will be subject to proof ab initio.
 
 
 84
 Under the foregoing circumstances OAKES and GURFEIN Circuit Judges adhere to their previous opinion, and VAN GRAAFEILAND, Circuit Judge adheres to his dissent.
 
 
 85
 ORDER ON PETITIONS FOR REHEARING OF PETITIONERS CHRISTOPHER
 
 McGRATH, JR., AND JOHN McGRATH
 
 86
 Petitioners Christopher McGrath, Jr., and John McGrath move separately for rehearing and rehearing en banc of this court's August 29, 1979, decision. Christopher McGrath, Jr., claims that the court distorted New York law, and John McGrath that the verdict below was misinterpreted with respect to him and that he should not have been held liable on a partnership theory.
 
 
 87
 PETITION OF CHRISTOPHER McGRATH, JR.
 
 
 88
 Petitioner Christopher McGrath, Jr., claims that the opinion both misconstrues the facts of his involvement and applies the wrong law. The first argument remains unconvincing. The second is inaccurate. It is petitioner who misstates the scienter requirements of New York law under Burgundy Basin Inn v. Watkins Glen Grand Prix, cited at 314, petitioner acted with intent.
 
 
 89
 Petitioner's best argument is that the judicially approved New York state settlement had the force of a judgment, barring plaintiff from instituting and appealing his federal case. He places primary reliance on Holm v. Shilensky, 388 F.2d 54 (2d Cir. 1968), in which this court, also applying New York law in diversity jurisdiction, declined to review an earlier Nevada decree allegedly obtained via fraud. But the ratio decidendi of Holm is solely that New York courts must give full faith and credit to the decree of the rendering state, and since the decree would not have been reviewable in Nevada, a New York court could not review it. Holm supports petitioner only if New York forbids the sort of challenge to an earlier decree here permitted. In support of that position, petitioner adduces Grossman v. Kass, 124 N.Y.S.2d 416 (Sup.Ct.1953). Grossman is, however, effectively supplanted by Byrnes v. National Union Insurance Co., cited at 312, quoted approvingly in National American Corp. v. Federal Republic of Nigeria, 597 F.2d 314, 323 (2d Cir. 1979). Byrnes holds that when plaintiffs do not ask for rescission of a release (which, as in the instant case, was judicially approved) but rather affirm it and sue for damages for fraud in its procurement, the new trial is legitimate. 310 N.Y.S.2d at 782. It is not barred by res judicata because it is for a different, albeit related, cause of action. See Inman v. Merchants Mutual Casualty Co., cited at 312, 83 N.Y.S.2d at 803.
 
 PETITION OF JOHN McGRATH
 
 90
 The opinion reinstates the first general verdict against all defendants. Petitioner John McGrath's new, separate counsel makes the new arguments that that verdict was vague, tentative, uncertain, and possibly not unanimous, see at 310-311 n. 13, and that the judge sent the jury back for further deliberation before petitioner had an opportunity to poll them, as was his right under Humphries v. District of Columbia, 174 U.S. 190, 194, 19 S.Ct. 637, 43 L.Ed. 944 (1899). Accordingly, the argument runs, it is unfair to hold petitioner liable under the first verdict the jury may or may not have intended to find against him.
 
 
 91
 Even accepting this as true the second verdict rather than the first would have to be reinstated. The jury therein found petitioner liable but assessed no monetary damages against him. While in state courts there is some disagreement as to whether a verdict against defendant for $0.00 amounts to judgment for plaintiff or defendant, see Annotations, 116 A.L.R. at 834; 49 A.L.R.2d at 1331, 1334, most federal cases interpret the verdict as a finding of defendant's liability to a given extent, viz., $0, e. g., Joseph v. Rowlen, 425 F.2d 1010, 1013 (7th Cir. 1970) ("We believe any distinction between an award of 6< and '0' damages is more of form than substance"); Wingerter v. Maryland Casualty Co., 313 F.2d 754, 756 (5th Cir. 1963) (verdict neither invalid nor ambiguous, no retrial needed); but see Association of Western Railways v. Riss & Co., 112 U.S.App.D.C. 49, 51, 299 F.2d 133, 135 (D.C.Cir.), cert. denied, 370 U.S. 916, 82 S.Ct. 1555, 8 L.Ed.2d 498 (1962) (remanding for entry of judgment for defendant since finding of no damage meant plaintiff had not proven claim).
 
 
 92
 Under this interpretation, the jury by its second verdict found petitioner a joint tortfeasor. Acting under erroneous apportionment instructions, however, it allocated none of the damages to him. This allocation, however, must be set aside under New York law which holds tortfeasors jointly and severally liable.
 
 
 93
 Therefore, even if petitioner should be judged by the second rather than the first verdict, his liability remains the same.
 
 
 94
 We are persuaded, however, that the alternative holding finding John McGrath liable as a matter of law for his partner's torts, at 316, is erroneous and should be eliminated. The case was not tried on this theory; were it, John McGrath could have taken steps, now foreclosed, to decrease his liability. He could have joined as a defendant both his partnership, see N.Y.C.P.L.R. § 1025, and his other partner, see N.Y.Partnership Law § 24. He may not be able hereafter to sue them for contribution. Because of the prejudice to petitioner of affirming on the basis of a theory not advanced below, the alternative holding should be and it hereby is stricken from the opinion.
 
 
 95
 The petitions for rehearing are otherwise each denied.
 
 
 96
 VAN GRAAFEILAND, Circuit Judge, adheres to his dissent.
 
 
 
 [1]
 Plaintiffs in the state malpractice action were the infant, Steven John Slotkin, and his father, Bert Slotkin. Bert Slotkin having died before the initiation of the fraud action, plaintiffs in the court below and appellants here are the infant again and Charlotte Slotkin, his mother, as executrix of the estate of Bert Slotkin
 
 
 [2]
 The court's charge was in part as follows:
 The plaintiffs did not sustain any damages unless they had a valid malpractice claim against the Brookdale Hospital. I have already explained to you how to determine whether they had such a valid claim. You must then determine the actual pecuniary loss, if any, suffered by the plaintiffs, that is, the difference between the amount which was actually paid on the settlement in 1971 and the amount which would have been the fair settlement value of the Slotkin case if plaintiffs had not been deceived.
 Assuming the parties meant to avoid further litigation and to compromise their dispute and that nothing but true facts were disclosed, how much could plaintiffs reasonably have demanded and the Brookdale Hospital reasonably have allowed as a final compromise? That is the fair settlement value.
 
 
 [3]
 Plaintiffs originally filed their complaint against ten reinsurers. They were: Allstate Insurance Co., American Motorists Insurance Co., American Mutual Insurance Co. of Boston, Employers Mutual Liability Insurance Co. of Wisconsin, Guaranty Reinsurance Co., Urbaine Fire Insurance Co., Grange League Insurance Co., National Casualty Co., Hardware Mutual Insurance Co., and Arkwright-Boston Manufacturers Mutual Insurance Co. Two of the reinsurers, Employers Mutual Liability Insurance Co. of Wisconsin and Grange League Insurance Co., were dismissed in 1977 by stipulation when it was shown that they had no conceivable connection to this matter. Another of the reinsurers, American Motorists Insurance Co., was a named defendant but was apparently never served; and it never appeared in the case (although Judge Pollack included it in his dismissal of all reinsurers). Hereafter, when we refer to "the reinsurers," we refer only to the seven active participants, i. e., all the above named reinsurers except American Motorists Insurance Co., Employers Mutual Insurance Co. of Wisconsin, and Grange League Insurance Co
 
 
 [4]
 Although Berkowitz insisted that the McGraths and Ratner told him about the $200,000 "policy limit," Berkowitz has not disputed Toberoff's statement that at this preliminary conference Berkowitz represented the coverage to be only $200,000 and that to the best of his knowledge there were no other policies. In fact, he has admitted that he did make such a representation to Justice Williams, although it is unclear from his deposition and his cross-complaint whether he made the statement at the preliminary conference or the final settlement negotiations. We note that in a colloquy that took place in Justice Williams' chambers at the March 4 conference Christopher McGrath stated that Berkowitz had told him that the Hospital had no coverage other than Citizens Casualty. We also note that Ratner also stated on deposition that he had asked Berkowitz whether there was any excess insurance above the $50,000 Citizens coverage (presumably a reference to the amount for which Citizens would ultimately be responsible) and that Berkowitz had said no. But see note 20 infra
 
 
 [5]
 The doctor explained, as is well known, that because diabetics lack the insulin necessary to break down the sugar in their bodies, their blood sugar (glucose) rises. As a result, there is an excessive loss of water as the body attempts to expel the extra sugar that the kidneys cannot absorb. Additionally, because sugar is not reaching the cells, other things, such as fats, begin to act as substitutes for the sugar. The liver cannot accommodate the extra fats; and they turn into ketone acids, called acetones. When acetone is produced it will appear in the urine; this condition is termed acetonuria. If acetonuria is allowed to continue unchecked the chemistry of the body becomes acidic, a condition known as acidosis. This acidosis is sometimes called ketoacidosis because it consists of acids which are ketone bodies, products of fatty-acid catabolism. The result can be fatal and, in a pregnant woman, fatal or permanently damaging to the fetus. See Churchill, Berendes & Nemore, Neuropsychological Deficits in Children of Diabetic Mothers, 105 Am.J.Obst. & Gyn. 257 (Sept.-Dec. 1969). Thus, by measuring the amounts of sugar and acetone in the urine, a doctor can determine whether a patient requires insulin at that time
 
 
 [6]
 The letter reads in part:
 In conclusion, it seems apparent that this mother developed moderately severe ketoacidosis somewhere between the evening of November 14 and the morning of November 15. This was due to the fact that an appropriate urine analysis was not done at 10 P.M. on the evening of November 14 or thereafter, when acetone in the urine would have been detected. Had this been done, the administration of insulin as ordered by the physicians could have averted the acidotic state on the morning of the 15th. This significant ketoacidosis, in my opinion, can be an adequate cause of brain injury in the premature newborn.
 
 
 [7]
 MR. (Christopher) McGRATH: The total coverage is $200,000, including reinsurance
 MR. TOBEROFF: So far as you are concerned.
 MR. McGRATH: Correct.
 MR. TOBEROFF: You have no knowledge as to whether the hospital has additional coverage with other companies? You have no knowledge of that?
 MR. McGRATH: I do have knowledge of that. We were the only company on the line at that time.
 Because Mr. McGrath indicated that he knew that there was no other coverage, we construe his statement as being a denial of excess insurance also.
 
 
 [8]
 One example of the Gilroy letters is as follows:
 MENDES & MOUNT 27 William Street New York, N.Y. 10005
 March 31, 1967
 Citizens Casualty Company of New York
 
 
 [33]
 Maiden Lane
 New York, N.Y. 10038
 (Attention) Mr. David Quigley, Examiner
 Your Ref: 7-8-44085
 Claimant: Steven John Slotkin
 D/A: November 11, 1963
 Our File: 210,609
 Dear Mr. Quigley:
 We are the attorneys representing the interest of the excess insurers for Beth El-Brookdale Hospital Center. We have received various letters sent by you to the assured stating that the litigation involves an amount in excess of your policy limits.
 We would like to have the opportunity in approximately two months time to review your file and discuss these claims with you. We will accordingly be telephoning you in several weeks to arrange a mutually convenient time for such a review and discussion.
 Very truly yours,
 MENDES & MOUNT
 By: ___
 ROBERT GILROY
 
 
 [9]
 Ratner was apparently in Florida during the trial below, and his deposition testimony taken in preparation for the trial was admitted into evidence as requested by plaintiffs' counsel. In a May 17, 1972, deposition Ratner stated that at the end of 1968 or sometime in 1969 he became aware that the Hospital had excess insurance when he "read a file for the first time and saw one or two letters from Mendes & Mount mentioning excess insurance." But, he stated, between the time that he read the file and the time of the state trial, he had "forgotten" that there was excess insurance. In an April 9, 1975, deposition Ratner stated that when he looked at the file shortly before trial, he noticed the letters from Mendes & Mount but that because the firm "was the reinsurer and not the excess carrier" in "hundreds" of other cases, he "associated (the firm) with their role as a reinsurer." But because the letters themselves explicitly disclose the excess insurance, Ratner cannot excuse his representations on the basis of a failure of memory or mistake
 
 
 [10]
 According to Ratner's testimony in deposition, two or three days after the trial ended, Robert Gilroy of Mendes & Mount as attorney for the excess insurer saw a story in the newspaper about the settlement and called Ratner to congratulate him. Ratner testified that he did not understand the purpose of the call, so he called Gilroy three or four days later to ask why Gilroy had called. Gilroy then stated that "(w)e had an excess on it," and only then according to Ratner did he remember that there was additional coverage
 
 
 [11]
 § 1207. Settlement of action or claim by infant or judicially declared incompetent, by whom motion made; special proceeding; notice; order of settlement
 Upon motion of a guardian of the property or guardian ad litem of an infant or, if there is no such guardian, then of a parent having legal custody of an infant, or if there is no such parent, by another person having legal custody, or if the infant is married, by an adult spouse residing with the infant, or of the committee of the property of a person judicially declared to be incompetent, the court may order settlement of any action commenced by or on behalf of the infant or incompetent. If no action has been commenced, a special proceeding may be commenced upon petition of such a representative for settlement of any claim by the infant or incompetent in any court where an action for the amount of the proposed settlement could have been commenced. If no motion term is being held and there is no justice of the supreme court available in a county where the action or an action on the claim is triable, such a motion may be made, or special proceeding may be commenced, in a county court and the county judge shall act with the same power as a justice of the supreme court even though the amount of the settlement may exceed the jurisdictional limits of the county court. Notice of the motion or petition shall be given as directed by the court. An order on such a motion shall have the effect of a judgment. Such order, or the judgment in a special proceeding, shall be entered without costs and shall approve the fee for the infant's or incompetent's attorney, if any.
 Rule 1208. Settlement procedure; papers; representation
 (a) Affidavit of infant's or incompetent's representative. An affidavit of the infant's or incompetent's representative shall be included in the supporting papers and shall state:
 
 
 [1]
 his name, residence and relationship to the infant or incompetent;
 
 
 [2]
 the name, age and residence of the infant or incompetent;
 
 
 [3]
 the circumstances giving rise to the action or claim;
 
 
 [4]
 the nature and extent of the damages sustained by the infant or incompetent, and if the action or claim is for damages for personal injuries to the infant or incompetent, the name of each physician who attended or treated the infant or incompetent or who was consulted, the medical expenses, the period of disability, the amount of wages lost and the present physical condition of the infant or incompetent;
 
 
 [5]
 the terms and proposed distribution of the settlement and his approval of both;
 
 
 [6]
 the facts surrounding any other motion or petition for settlement of the same claim, of an action to recover on the same claim or of the same action;
 
 
 [7]
 whether reimbursement for medical or other expenses has been received from any source; and
 
 
 [8]
 whether the infant's or incompetent's representative or any member of the infant's or incompetent's family has made a claim for damages alleged to have been suffered as a result of the same occurrence giving rise to the infant's or incompetent's claim and, if so, the amount paid or to be paid in settlement of such claim or if such claim has not been settled the reasons therefor
 (b) Affidavit of attorney. If the infant or incompetent or his representative is represented by an attorney, an affidavit of the attorney shall be included in the supporting papers and shall state:
 
 
 [1]
 his reasons for recommending the settlement;
 
 
 [2]
 that directly or indirectly he has neither become concerned in the settlement at the instance of a party or person opposing, or with interests adverse to, the infant or incompetent nor received nor will receive any compensation from such party, and whether or not he has represented or now represents any other person asserting a claim arising from the same occurrence; and
 
 
 [3]
 the services rendered by him
 (c) Medical or hospital report. If the action or claim is for damages for personal injuries to the infant or incompetent, one or more medical or hospital reports, which need not be verified, shall be included in the supporting papers.
 (d) Appearance before court. On the hearing, the moving party or petitioner, the infant or incompetent, and his attorney shall attend before the court unless attendance is excused for good cause.
 (e) Representation. No attorney having or representing any interest conflicting with that of an infant or incompetent may represent the infant or incompetent.
 (f) Preparation of papers by attorney for adverse party. If the infant or incompetent is not represented by an attorney the papers may be prepared by the attorney for an adverse party or person and shall state that fact.
 
 
 [12]
 There is substantial evidence of the medical malpractice. In addition to the testimony of plaintiffs' experts, Drs. Bernstein, Olninc, and Greenspan, in text supra at note 5, there is the letter from defendants' expert, Dr. Zarowitz, note 6 supra. See also note 5 supra
 
 
 [13]
 In fact there were no real supplementary instructions but rather colloquy and direction. The entire transcript of what took place in the jury's presence is as follows:
 THE COURT: Madam Forelady, has the jury agreed upon a verdict?
 THE FORELADY: Yes.
 THE COURT: This says that you have reached a verdict. You may make inquiries, Mr. Clerk.
 The Clerk will ask you about each name and then you will advise what your verdict is.
 THE CLERK: What is your verdict as to the defendant Citizens Casualty Company of New York?
 THE FORELADY: We have decided against.
 THE COURT: Is that your whole verdict?
 THE FORELADY: Yes.
 THE COURT: Is there any amount of verdict against them?
 You decided against them, did you say?
 THE FORELADY: Yes.
 THE COURT: In what amount, if any?
 THE FORELADY: We have an amount for all.
 THE COURT: What is the amount that the jury has found? In other words, you have found the same amount against all defendants?
 THE FORELADY: A total of $680,000 total against all of them.
 THE COURT: Your verdict against the Citizens Casualty is what?
 THE FORELADY: We didn't break it down, your Honor.
 THE COURT: Has the jury found that each of the defendants is liable for the $680,000? Is that what you are saying?
 THE FORELADY: Yes, your Honor.
 THE COURT: In other words as to the defendant Citizens Casualty, Paul Ratner, Chris McGrath, John McGrath and George Berkowitz, your verdict is $680,000?
 THE FORELADY: Yes, your Honor.
 THE COURT: Poll the jury.
 (Jury roll called all present.)
 THE CLERK: You say that you find in favor of the plaintiff Steven John Slotkin as against the defendant Citizens Casualty Company of New York, Paul Ratner, Christopher McGrath, John McGrath and George Berkowitz in the sum of $680,000.
 JUROR NUMBER TWO: Combined.
 THE COURT: When you say total combined, let me understand that. You have reached one verdict?
 JUROR NUMBER FOUR: One verdict, one total against all combined. I hope it wasn't misunderstood that it was against each one.
 THE FORELADY: A total.
 THE COURT: The way the verdict stands now, it is a verdict against each one for $680,000.
 THE FORELADY: No, all told.
 THE COURT: The only collectibility will be a total of $680,000.
 Is that what you are saying?
 THE FORELADY: Yes.
 THE COURT: That means that each one is held individually
 JUROR NUMBER TWO: A fraction of.
 JUROR NUMBER FOUR: A portion of, pro rated.
 THE COURT: If it is a pro rated verdict, that is one thing. On the other hand, if you intend a proportionate verdict only, that is, for each one in a particular amount that's a different thing. So, I have to send you back for you to decide what verdict you wish to render. The defendants are sued individually, and although you say there is only one total recovery, if you have all indicated the amount among them, that's one kind of a verdict.
 If you have not allocated the verdict among them, any one is responsible for the whole $680,000.
 So, you better go out and decide what it is that you are trying to call to our attention.
 Will the jurors go back for a moment while I talk to counsel, to be sure I have a correct understanding of what it is Juror Number Four, I think it was, tried to convey to me.
 THE COURT: Bring in the jury.
 (Jury present.)
 THE CLERK: Madam Forelady, has the jury agreed upon a verdict?
 THE FORELADY: Yes, we have.
 THE COURT: Read the verdict.
 THE CLERK: (Reading) We have a verdict in favor of the plaintiff for $680,000 to be apportioned in this manner: Citizens Casualty $500,000, Mr. Berkowitz $100,000, Mr. Ratner $60,000, Chris McGrath $20,000, John McGrath nothing.
 Signed Anna D. O'Shea, Forelady.
 THE COURT: Poll the jury.
 (Each juror, upon being asked by the Clerk "Is that your verdict?", answered in the affirmative.)
 THE COURT: All right, ladies and gentlemen, that completes your service in this case. Thank you very much for your attention and the time that you spent. You are now excused.
 (Jury discharged.)
 
 
 [14]
 The ground for dismissal is not readily discernible although it appears to be that the jury did not find John McGrath liable. After the jury rendered its allocated verdict, counsel for the McGraths began to make a motion as to "George McGrath." The court interrupted, saying that there was no verdict against John McGrath. Counsel quickly agreed, stating that zero damages was really a verdict in John McGrath's favor. The court did not disagree and immediately dismissed the complaint as to him
 Plaintiffs' attorney excepted to the dismissal on the ground that the jury's verdict of liability, before it apportioned damages, was a verdict against all the defendants, including John McGrath. The court responded that "there was no competent evidence within the burden of proof obligatory in a fraud case" of any intent on his part to deceive nor gross negligence or pretense of knowledge. Plaintiffs' attorney began to catalogue the evidence against John McGrath to show that it was sufficient "to raise a triable issue of fact." The court, however, countered that "(a)ny verdict against John McGrath would have been clearly against the weight of the credible evidence and would have been clearly set aside on that ground as well as the ground already mentioned." By this last ground the judge further disclosed his belief that the jury's failure to allocate any damages to John McGrath was in effect a finding of no liability; we note that he stated that a verdict against John McGrath "would have been set aside."
 
 
 [15]
 Appellants do not contest Judge Pollack's ruling that they had to prove in the federal trial that they had a valid malpractice claim in the state court, a ruling based on Urtz v. New York Central & Hudson River R. R. Co., 202 N.Y. 170, 175-76, 95 N.E. 711, 712-13 (1911)
 
 
 [16]
 See also Automobile Underwriters v. Rich, 222 Ind. 384, 53 N.E.2d 775 (1944); Southern Ry. Co. v. Jaynes, 86 Ind.App. 451, 140 N.E. 556, 558 (1923); Ware v. State Farm Mut. Auto. Ins. Co., 181 Kan. 291, 311 P.2d 316, 320-21 (1957); Mlnazek v. Libera, 83 Minn. 288, 86 N.W. 100, 101-02 (1901); Brown v. Ocean Accident & Guar. Corp., 153 Wis. 196, 140 N.W. 1112, 1114-15 (1913)
 
 
 [17]
 The fraud here was a statement that the defendants knew that there was no additional insurance when, in fact, they did not know that
 
 
 [18]
 The court below used both the words "inchoate" and "unenforceable." And, technically, before judicial approval the settlement was both. But the characterizations are relevant only from the standpoint of determining the defendants' obligations under the applicable state law. They do not go to the question of plaintiffs' detrimental reliance which occurred on settlement and dismissal of the jury and not on the court's approval of the settlement
 
 
 [19]
 We note that according to the expert testimony of former Justice Bernard Meyer (now Judge of the Court of Appeals) and Justice Frank B. McCullough, both retired from the New York Supreme Court, under New York law doctors could not be forced to provide live opinion testimony in state court. Thus in a retrial of the malpractice action in the state court, plaintiffs would have been unable to obtain the oral testimony of their key witnesses after they refused to testify voluntarily. This is true even though under federal law one can compel expert testimony by subpoena. Indeed, although Drs. Bernstein and Greenspan agreed to testify voluntarily in the federal fraud action, they did so only after being told that if they refused they would be subpoenaed. (Dr. Olninc was unavailable by reason of a failure of memory with age, and his testimony from the state court trial was read into the federal record.) Thus one cannot equate success in the 1977 federal fraud action with a lack of detriment and damage in the 1971 state malpractice action as Judge Pollack did. Slotkin v. Citizens Casualty Co. of New York, 447 F.Supp. 253, 257 (S.D.N.Y.1978)
 Moreover, even without regard to the difference between the state and federal procedure, Judge Pollack's position proves too much. By proceeding with the fraud action, plaintiffs did not eliminate the prejudice that they had suffered. When the defendants' conduct put plaintiffs in a disadvantageous position, plaintiffs were injured; they did not stop being injured just because they were able to overcome the injury. Under Judge Pollack's view, the victim of fraud would never be able to recover his damages by electing to affirm the settlement and sue for damages in deceit; no matter what the prejudice, his success in proving the underlying cause of action would demonstrate the absence of prejudice in proceeding by retrial. Because New York law allows the fraud victim to proceed by affirmance and an action for deceit, we cannot subscribe to Judge Pollack's view of the relationship between the two causes of action.
 
 
 [20]
 The trial court's instructions quite accurately presented to the jury these alternative bases for a finding of fraud. The court charged that the jury must find scienter and that
 a person makes a misrepresentation with scienter, meaning knowingly, if he knows that the representation is false, or he neither knows nor cares whether it is true or false, or if he has no genuine belief that it is true. If a speaker actually believes that what he says is true, then he does not act with scienter, even though that belief is negligent, in that a reasonable man would not believe it.
 There is one exception to what I have just told you. If you find that the defendant whom you are considering intended that it should be understood that what he said about the hospital's insurance was true to his personal knowledge and intended that the plaintiffs should act on the basis of what he said, then you should find that said defendant acted with scienter if he didn't know what he (said) was true. To this extent, a person who asserts a falsehood as true to his personal knowledge may be said to have acted with scienter, that is, knowingly, even though he believes what he says to be true.
 
 
 [21]
 We note that Ratner did not speak with Berkowitz until after the McGraths had informed Berkowitz about the policy limit
 
 
 [22]
 See note 14 supra
 
 
 [23]
 See also Johns Hopkins Univ. v. Hutton, 422 F.2d 1124, 1130 (4th Cir. 1970), cert. denied, 416 U.S. 916, 94 S.Ct. 1622, 40 L.Ed.2d 118 (1974); Jerger v. Rubin, 106 Ariz. 114, 471 P.2d 726, 731 (1970)
 
 
 [24]
 The parties alluded at trial to a stipulation among the defendants to try the "cross claims" to the court in a nonjury trial if the jury found liability. Why this was abandoned in favor of a resubmission to the jury after the basic verdict if that is what occurred does not appear in the record on appeal, which does not contain the stipulation. How to proceed on the cross claims for contribution, indemnification, and the like is, of course, a matter for the district court on remand
 
 
 [1]
 Ratner and appellee carriers likewise had little if anything to gain by concealing the existence of the umbrella policy. The maximum exposure of Citizens Casualty Co., Ratner's employer, was $50,000, all of which was on the table when the several settlement offers were made. Fraudulent settlement for $185,000 would save the seven reinsurance carriers a total of $15,000. In the case of one carrier, which carried only five percent of the reinsurance, the saving would amount to $750
 
 
 [2]
 As a general rule, malpractice policies do not insure against fraudulent acts or omissions. See, e. g., St. Paul Fire & Marine Insurance Co. v. Clarence-Rainess & Co., 70 Misc.2d 1082, 1083, 335 N.Y.S.2d 169 (1972), aff'd, 41 A.D.2d 604, 340 N.Y.S.2d 587 (1973). The McGraths' policy so provides, and they are being defended by their insurance carrier pursuant to a stipulation that the carrier will not be responsible for the payment of any judgment against them which sounds in fraud
 
 
 [3]
 The applicable Rules of Practice of the Appellate Division, First Department, also required that an application for court approval of a settlement of a claim or cause of action belonging to an infant be made as provided in CPLR 1207 and 1208. See 22 Codes, Rules and Regulations of the State of New York § 603.8. If the procedures mandated by these sections were not complied with, the application for approval of the settlement had to be denied. Speights v. Motor Vehicle Accident Indemnification Corp., 75 Misc.2d 937, 348 N.Y.S.2d 691 (1973); Bittner v. Motor Vehicle Accident Indemnification Corp., 45 Misc.2d 584, 257 N.Y.S.2d 521 (1965)
 
 
 [4]
 If the state court judge had indicated that he would not sign the order of settlement, one wonders how much either of my learned colleagues would have been willing to pay for an assignment of plaintiffs' rights under the "technically inchoate" agreement
 
 
 [5]
 "A false representation is not cognizable by the law as deceit unless it is believed and relied upon as an inducement to action."
 Ochs v. Woods, supra, 221 N.Y. at 338, 117 N.E. at 306.
 "The maker of a fraudulent misrepresentation is not liable to one who does not rely upon its truth but upon the expectation that the maker will be held liable in damages for its falsity."
 
 
 [3]
 Restatement of Torts § 548
 
 
 [6]
 The majority opinion would lead one to believe that the retrial of an action is such a rare occurrence as to justify drastic sanctions for the party causing it. This simply is not so. Retrials are constantly being ordered with no greater sanctions imposed than the liability for additional costs and disbursements. See, e. g., Dunbar v. Ingraham, 275 App.Div. 898, 89 N.Y.S.2d 841 (1949)
 I am not impressed by the argument that appellants' doctors could not have been compelled to give opinion testimony if the state court action had been retried. The doctors could have been subpoenaed and required to testify as to all of their factual observations. Had they then refused to repeat the expert testimony they had given on the prior trial, it could have been read into evidence. CPLR 4517. It is inconceivable that any doctor, sitting on the witness stand, would forego a lucrative fee for testifying as an expert, and at the same time put the medical profession and his own standing in disrepute, by repeating his factual observations but refusing to reiterate his opinion based thereon.
 
 
 [7]
 The only testimony given by Ratner was by deposition, in which he said that he obtained the consent of the reinsurers to settle for $185,000. I disagree with the majority's holding that this established an agency relationship with the reinsurers and opened the floodgates to any hearsay statements of Ratner that plaintiffs were thereafter prepared to offer. See O. A. Skutt, Inc. v. J. & H. Goodwin Ltd., 251 App.Div. 84, 86, 295 N.Y.S. 772 (1937); United States v. Consolidated Laundries Corp., 291 F.2d 563, 576 (2d Cir. 1961). However, for purposes of this opinion, I need not enter the dispute between my colleagues and Judge Pollack concerning out-of-court declarations. Accepting all of the testimony offered by plaintiffs, it is nonetheless insufficient to establish that Ratner was the agent of the seven reinsuring carriers
 
 
 [8]
 My brothers do not say whether Ratner's subordinates at Citizens were also acting as agents for the reinsurers
 
 
 [9]
 The securing of consent is not the equivalent of submission to control. For example, the approval of at least one other judge is required every time an opinion is filed in this Court. If this were sufficient to make the writing judge the agent of his concurring brothers, this Court might at one time have lost several of its most able and distinguished members. See United States v. Manton, 107 F.2d 834, 846 (2d Cir. 1939), cert. denied, 309 U.S. 664, 60 S.Ct. 590, 84 L.Ed. 1012 (1940)
 
 
 [1]
 Our opinion said, at 316:
 The reinsurers were closely involved in all the transactions leading up to the settlement. They had written notice of the state court trial, and they had an absolute right to all information concerning any matter affecting their coverage. Moreover, their consent was needed for any settlement within the reinsured range, i.e., over $50,000. There was abundant evidence, including Ratner's own testimony, that throughout the trial Ratner communicated with each of them either directly or through his subordinate. Ratner told Toberoff that he had to telephone the reinsurers as soon as the settlement talk crossed the $50,000 line. Indeed, Toberoff provided Ratner with a copy of the National Institutes of Health study better to enable Ratner to persuade the reinsurers to settle. Ratner testified that he contacted each of the reinsurers to obtain their final consent to the $185,000 settlement. And according to Toberoff's testimony in the court below, Berkowitz told him at the time of the settlement negotiations that Ratner was talking to the reinsurers; Christopher McGrath confirmed that Ratner told him that he, Ratner, had obtained the reinsurers' consent to the settlement.
 
 
 [2]
 While Ratner's critical testimony on deposition was most equivocal, he did testify (348A) that "(t)here might have been one conversation where I obtained (the reinsurers') consent to settle the case for $185,000," by which he said he meant, "I called each one individually but it concerned this one matter."