Alice **LAWRENCE, Suzanne Lawrence, Richard Lawrence, and Marta Jo Lawrence, individually, and on behalf of the Estate of Sylvan Lawrence, including the Residuary Trust, Plaintiffs,**

v.

**Seymour COHN, Defendant.**

**No. 90 Civ. 2396 (CSH).**

United States District Court, S.D. New York.

July 12, 1996.

Graubard, Mollen, Horowitz, Pomeranz & Shapiro (Steven Mallis, of counsel), New York City, for Plaintiffs.

Shea & Gould (Milton S. Gould, of counsel), New York City, for Defendant.

## MEMORANDUM OPINION AND ORDER

HAIGHT, Senior District Judge:

This complex case, arising out of the administration of the estate of a New York resident, has engaged and continues to engage the attention of this Court and the Surrogate's Court for New York County.

In 1994, after extensive motion practice in this Court, trial was scheduled to begin in the Surrogate's Court. In that circumstance, Magistrate Judge Grubin signed an order on May 18, 1994, placing the captioned case on this Court's suspense calendar. Counsel were instructed to notify this Court when trial in the Surrogate's Court was concluded. Counsel have not given such notice.

At the time Judge Grubin signed the order placing the case on suspense, a motion by defendant challenging the amended complaint on various grounds was pending, fully submitted, in this Court. I conclude that it is appropriate to file an Opinion deciding this motion now. To do so does not contravene the suspense order, the motion being *sub judice* before the order was signed. Resolving the issues before this Court at this time will assist in the further administration of the case.

### I. *Preliminary Statement*

Plaintiffs are beneficiaries under the will of the late Sylvan Lawrence, who died in December, 1981. The will grants plaintiff Alice Lawrence, the decedent's wife, 50% of the Lawrence Estate (the "Estate") in the form of an outright bequest, and directs that the other 50% be placed in a residuary trust for the decedent's three children. Defendant Seymour Cohn, Lawrence's brother, is sole executor of the Estate and trustee of the residuary trust created by the will. Cohn is also the sole general partner of a partnership in which the Estate has a substantial stake.

The Lawrence will was admitted to probate by the Surrogate of New York County on January 29, 1982. On February 1, 1982, Letters Testamentary and Letters of Trusteeship were issued to defendant as sole executor and sole trustee.

Plaintiffs accuse defendant Cohn of numerous acts of fraud and breaches of fiduciary duty. The parties have been engaged in litigation in the New York County Surrogate's Court (Hon. Renee R. Roth) since 1983.

In 1990, plaintiffs filed the instant action in this Court. They charge Cohn with violations of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (the "Exchange Act" or "1934 Act"), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5; and with violations of the RICO statute, 18 U.S.C. §§ 1962(a), (b) and (c).

To these federal claims, plaintiffs append claims for common law fraud, breach of contract and unjust enrichment. They pray for the imposition of a constructive trust on certain partnership interests acquired by defendant; a conveyance of those interests to plaintiffs and/or the Estate; an accounting; compensatory damages (trebled under RICO); punitive damages; and attorneys' fees and costs.

Subject matter jurisdiction in this Court depends on the viability of the § 10(b) and RICO claims.[1] Defendant moves to dismiss the complaint pursuant to Rule 12(b)(1) and Rule 12(b)(6), arguing that plaintiff has failed to state a federal securities or RICO claim, and that therefore jurisdiction is lacking. Defendant also asserts that plaintiffs lack standing to bring the section 10(b) claim, and that they are collaterally estopped from doing so. Finally, defendant asks the Court to abstain from exercising its jurisdiction over all claims in deference to the Surrogate's Court.

## II. *Background*

The following factual recitations are based on allegations in the amended complaint, which are taken as true for the purposes of defendant's Rule 12(b)(6) motion.[2]

Prior to the death of Sylvan Lawrence, Lawrence and Cohn were the sole general partners of a limited partnership known as Ninety–Five Wall Street Company (the "Limited Partnership"). The Limited Partnership's principal asset was and remains an office building located at 95 Wall Street. At the inception of the Limited Partnership, Lawrence and Cohn owned a combined 60% interest as general partners; Jack R. Aron owned an 11% interest as a limited partner; Marvin H. Schur owned a 4% interest as a limited partner; Edward D. Roberts owned a 1% interest as a limited partner; Schur and Bernard E. Brandes, as trustees for the benefit of Robert Aron, owned a 12% interest as a limited partners; and Schur and Brandes, as trustees for the benefit of Peter Arthur Aron, owned a 12% interest as limited partners.

In paragraph 9, the Limited Partnership agreement provides:

> If either Sylvan Lawrence or Seymour Cohn shall die, retire of be adjudicated incompetent, the partnership shall not terminate and the other of them shall continue as the sole General Partner. The retired General Partner or the legal representatives of the deceased or incompetent General Partner shall be and become a Limited Partner and the share of such retired Partner or of such representatives in the profits, losses including depreciation, and the distributions shall be 30%. The interest of the remaining General Partner shall thereafter be 30%.

Under this provision, Sylvan Lawrence's interest as a general partner in the Limited Partnership was, upon his death, automatically converted into a 30% limited partnership interest in favor of his Estate; Cohn became the sole general partner with the exclusive right to manage and control the affairs of the Limited Partnership.

The Limited Partnership agreement also provided in paragraph 8(b):

> In the event that any one or more of the Limited Partners (hereinafter called "Offering Limited Partner") shall receive and

---

1. The complaint also cites the diversity statute, 28 U.S.C. 1332, but fails to allege complete diversity: plaintiff Suzanne Lawrence and defendant are both alleged to be residents of Florida. *See* Amended Complaint at ¶¶ 2, 5.

2. The background section is taken in large part from a prior opinion in this case. *See Lawrence v. Cohn,* 778 F.Supp. 678 (S.D.N.Y.1991).

wish to accept a bona fide offer for the purchase of his interest in the partnership (hereinafter called the "Outside Offer"), the Limited Partner shall promptly notify the other Limited Partners thereof giving the name and address of the offeror ("Outside Offeror") and a copy of the Outside Offer containing all the terms and provisions thereof, and the other Limited Partners shall be privileged to purchase the interest of the Limited Partner on the same terms as the Outside Offer in the proportion that their respective interests bear to the aggregate interests of all of the Limited Partners other than the interest of the Offering Limited Partner. If the Limited Partners have not agreed to purchase the interest of the Offering Limited Partner within 15 days after the Offering Limited Partner has advised them of the Outside Offer, then the rights of the Limited Partners or any of them to purchase the interest of the Offering Limited Partner shall cease and thereupon at the expiration of such 15 days, the Offering Limited Partner shall advise the General Partner of the Outside Offer, giving to the General Partner the name and address of the Outside Offeror and a copy of the Outside Offer containing all the terms and provisions thereof, and the General Partner shall have the right to purchase the interest of the Offering Limited Partner at the same price and terms as contained in the Outside Offer, provided the General Partner agrees so to do within 15 days after the giving of such notice to it.

On May 23, 1983, Cohn agreed with all of the then-existing limited partners, aside from the Estate, to purchase their Limited Partnership interests. Cohn purchased those interests, totalling 40% of the Limited Partnership, "as nominee for Seymour Cohn, as Executor of the Estate of Sylvan Lawrence, for Seymour Cohn individually, and for any combination thereof." Plaintiffs allege that the provision above vested the Estate with a right of first refusal over that purchase.

By order to show cause dated August 18, 1983, Cohn commenced a proceeding in the Surrogate's Court seeking the court's advice and direction regarding who, as between him and the Estate, should own the 40% limited

partnership interests acquired pursuant to the limited partners buy-out agreement entered into in May 1983 (the "advice and direction proceeding"). In connection with that proceeding, Cohn submitted an affidavit outlining his opinion of the value of the limited partnership interests, and the wisdom of the Estate purchasing all or part of the interests up for sale. Cohn named the plaintiffs as respondents in the advice and direction proceeding.

On May 17, 1984, Cohn and the plaintiffs entered into a settlement taking the form of a purchase and sale agreement which provided for the final disposition of the 40% limited partnership interests. Pursuant to that agreement, the Estate obtained one-half of these interests, and Cohn acquired one-half individually. The Surrogate signed a consent decree approving this settlement.

Plaintiffs allege that prior to the May 1984 settlement purchase and sale agreement, Cohn fraudulently concealed from plaintiffs the true facts regarding the status of negotiations with lessees of space at 95 Wall Street, particularly Chemical Bank. The effect of those allegedly fraudulent omissions was to make the building appear less valuable than it was. Plaintiffs allege that had Cohn timely informed them of the true facts,

> [p]laintiffs would not have signed the Purchase and Sale Agreement—in which the Estate relinquished and conveyed to [Cohn] individually a portion of its right to purchase the entire 40 percent limited partnership interests acquired pursuant to the Limited Partners Buy–Out Agreement—and would instead have caused the Estate to purchase the entire amount of such interest.

Complaint at ¶ 92. Plaintiffs allege consequent injury to themselves and to the Estate, including the residuary trust created under that will.

Plaintiffs allege further wrongdoing on the part of Cohn, commencing soon after the death of Lawrence. They allege that starting in 1983, Cohn doubled and then further increased the salary he drew from Sylvan Lawrence Co., the leasing, management and brokerage arm of the "master partnership"

between Lawrence and Cohn as co-equal partners which held title to numerous real estate properties in and around New York City. Plaintiffs further allege that Cohn has maintained inflated and improper reserves in the Estate as a pretext for not distributing monies to its beneficiaries. Plaintiffs also claim that Cohn has continued in the fraudulent concealment of the 95 Wall Street transactions. And finally, plaintiffs allege that Cohn has wrongfully refused to wind up the affairs of the Estate, in furtherance of his plan to maintain control over its assets for the rest of his life.

These disputes have been the subject, over a number of years, of litigation in the Surrogate's Court. As of the time of the filing of this motion, three such actions were pending.[3] The first action was commenced by Alice Lawrence in 1987, and alleges, *inter alia*, that Cohn breached fiduciary duties to the Estate's beneficiaries in failing to distribute the Limited Partnership's cash reserves. The second proceeding was instituted by Cohn in 1988 to settle his account of the administration of the Estate from December 8, 1981 through November 30, 1986. The third suit, commenced by Alice Lawrence in 1988, requests a compulsory final accounting and an order dissolving the Limited Partnership. Underlying this suit are allegations of wrongdoing on the part of Cohn, many of which are similar to allegations in the present complaint.

Since these disputes have also been the subject of extensive litigation in this Court, I will provide a brief procedural sketch of the case before turning to the merits of defendant's motion to dismiss.

### III. *Procedural History*

The Amended Complaint was previously the subject of a motion to dismiss in 1991.

That motion to dismiss was, in large part, similar to the one presently before the Court. Defendant challenged both the 10(b) claim and the RICO claim on 12(b)(6) grounds, and alternatively, argued in favor of abstention.

I granted defendant's motion to dismiss in an opinion dated November 12, 1991. *See Lawrence v. Cohn,* 778 F.Supp. 678, 686 (S.D.N.Y.1991). In the first section of that opinion, I held that plaintiff's 10(b) claim was time-barred under the uniform statute of limitations period enunciated by the Supreme Court in *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991). *See id.* at 682. *Lampf* required that a federal securities action be brought within one year after discovery of the facts constituting the violation and within three years after the violation itself. At the time of my 1991 opinion, the Second Circuit had held that *Lampf* "[was] to be applied retroactively to all cases not finally adjudicated on the date when *Lampf* was decided." *Welch v. Cadre Capital,* 946 F.2d 185, 188 (2d Cir.1991).[4] The present case fell within that category, and was therefore time-barred.

I then declined to assert jurisdiction over the remaining RICO and state law claims. That decision was based on the three separate abstention doctrines conceived by the Supreme Court in *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) ("*Younger*" abstention), *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943) ("*Burford* abstention"), and *Colorado River Water Conservation Dist. v. U.S.,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976) ("*Colorado River* abstention"). At the most rudimentary level, abstention was appropriate because plaintiff's claims were be-

---

**3.** These actions are not mentioned in the complaint. I mention them only because they are relevant to my ensuing discussion of abstention. They have no bearing whatsoever on my resolution of defendant's 12(b)(6) motion.

In stating that these actions were pending at the time of the filing of the instant motion, I rely on representations made in defendant's memorandum in support of his motion to dismiss. Plaintiff has not disputed defendant's assertions in this regard, so I assume them to be true.

**4.** In coming to this conclusion, the Second Circuit relied on the Supreme Court's ruling in *James B. Beam Distilling Co. v. Georgia,* 501 U.S. 529, 111 S.Ct. 2439, 115 L.Ed.2d 481 (1991). In that case, the Supreme Court held that "in the civil context it is error not to apply retroactively to all cases pending on direct review a rule of federal law previously applied retroactively in the case announcing the rule." *Welch,* 946 F.2d at 186.

ing fully litigated in the Surrogate's Court. *See id.* at 682–86.

The Clerk of the Court entered an order of judgment dismissing the case on November 25, 1991. Plaintiffs noticed their appeal to the Second Circuit on December 12, 1991. Just one week later, on December 19, 1991, Congress enacted the Federal Deposit Insurance Corporation Improvement Act of 1991 (codified at Securities and Exchange Act of 1934, § 27A, 15 U.S.C. § 78aa–1), (section 27A), the effect of which was to eliminate the retroactive application of *Lampf*'s one year/three year statute of limitations. The statute instructs a court to apply the statute of limitations of the jurisdiction in which it sits to section 10(b) actions commenced prior to June 19, 1991, the date *Lampf* was decided. In addition, any pre-*Lampf* claims which were previously dismissed as time-barred, and which would have been timely under law of the jurisdiction as it existed on June 19, 1991, were reinstated under the terms of the statute.[5]

Relying on the terms of this provision, plaintiffs filed an Order to Show Cause for Vacatur of Judgment and Order pursuant to Rule 60(b), which this Court declined because of the pendency of plaintiffs' appeal. Upon the advice of staff counsel to the Second Circuit, plaintiffs wrote this Court, asking whether I would consider plaintiffs Rule 60(b) motion if the Second Circuit were to remand the case for that purpose. I answered this question in the affirmative, and on February 4, 1992, the Second Circuit remanded the case for consideration of the Rule 60(b) motion, staying all other appellate proceedings pending the disposition of that motion.

In an opinion dated February 23, 1993, I held that section 27A required the vacatur of my November 12, 1991 order. *See Lawrence v. Cohn,* 816 F.Supp. 191, 195–96 (S.D.N.Y. 1993). I refused defendant's suggestion to reinstate only the section 10(b) claim, as opposed to the entire complaint. To do so would have contravened the limited purpose of the remand: to decide whether or not my earlier order should be vacated in its entirety. *See id.* at 196–97.

Defendant now renews its motion to dismiss. For reasons that follow, I deny this motion as to plaintiff's 10(b) claim, but abstain from exercising jurisdiction over plaintiff's RICO and state law claims.

## IV. *The Motion to Dismiss the Section 10(b) Claim*

In order to state a claim under section 10(b) and Rule 10b–5, a plaintiff must allege material misstatements or omissions which evince an intent to deceive or defraud in connection with the purchase or sale of a security. *See Luce v. Edelstein,* 802 F.2d 49, 55 (2d Cir.1986). The plaintiff must also allege that he suffered economic loss as a result of these misstatements or omissions ("loss causation") and that a reasonable investor would have considered them important in making his investment decisions ("transaction causation"). *See Schlick v. Penn–Dixie Cement Corp.,* 507 F.2d 374, 380 (2d Cir.1974), *cert. denied* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975).

Plaintiff's 10(b) claim centers exclusively around alleged misrepresentations made by Cohn in connection with the purchase of the Limited Partnership interests. As I have described above, the complaint alleges that Cohn concealed lease negotiations with a pro-

---

**5.** Section 27A provides:

(a) EFFECT ON PENDING CAUSES OF ACTION—
The limitation period for any private civil action implied under Section 10(b) of this Act that was commenced on or before June 19, 1991, shall be the limitation period provided by the laws applicable in the jurisdiction, including principles of retroactivity, as such laws existed on June 19, 1991.
(b) EFFECT OF DISMISSED CAUSES OF ACTION—

Any private civil action implied under Section 10(b) of this Act that was commenced on or before June 19, 1991—
(1) which was dismissed as time-barred subsequent to June 19, 1991, and
(2) which would have been timely filed under the limitation period provided by the laws applicable in the jurisdiction, including principles of retroactivity, as such laws existed on June 19, 1991
shall be reinstated on motion by the plaintiff not later than 60 days after the date of the enactment of this section.

spective tenant so as to make the partnership property appear less valuable and induce plaintiffs to enter into a settlement in which they effectively waived their right of first refusal over that purchase.

Defendant identifies what he considers to be two principal pleading deficiencies in the section 10(b) allegations: a failure to plead loss causation, and a failure to allege the "purchase or sale" of a "security," as those terms are defined in the Exchange Act and Supreme Court jurisprudence. Defendant also urges three separate grounds for dismissal. He contends that plaintiffs lack standing to pursue this 10(b) claim, that the Surrogate's Court consent decree precludes this action, and finally, that I should abstain from considering the 10(b) claim in deference to that court. These are threshold issues, so I consider them first before turning to the sufficiency of plaintiff's allegations under Rule 12(b)(6).

### A. *Standing*

In every case, the issue of standing must be addressed at the outset. Standing is jurisdictional under Article III of the United States Constitution. *See Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 471–76, 102 S.Ct. 752, 757–61, 70 L.Ed.2d 700 (1982). Accordingly, putative plaintiffs lacking standing are not entitled to have their claims litigated in Federal court.

■ The rule in this Circuit has long been that only *actual* purchasers and sellers of securities can bring a cause of action for securities fraud under section 10(b). *See Birnbaum v. Newport Steel Corp.,* 193 F.2d 461, 463–63 (2d Cir.1952), *cert. denied,* 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952). The Supreme Court gave its stamp of approval to this rule in *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 731, 95 S.Ct. 1917, 1923, 44 L.Ed.2d 539 (1975). In that case, defendant had been compelled to offer new shares at a low price pursuant to a consent decree. Plaintiff alleged that it did not purchase the offered shares because defendant had made pessimistic misrepresenta-

tions concerning their value in the prospectus. The Court held that the plaintiff lacked standing to bring a section 10(b) claim because it had not purchased or sold any shares in reliance on the alleged misrepresentations. *See id.* at 749, 95 S.Ct. at 1931–32.

The Court's decision to uphold the *Birnbaum* rule rested primarily on policy considerations. The Court conceded that the limitation was somewhat arbitrary, but felt that the need to curb vexatious litigation unrelated to securities transactions justified its imposition. *See id.* at 739–748, 95 S.Ct. at 1927–31.

Citing to *Birnbaum* and *Blue Chip Stamps,* defendant claims that plaintiffs lack standing to bring their 10(b) claim because the Estate was the actual purchaser of the Limited Partnership interests. In essence, defendant argues that only the executor of the Estate—namely, Seymour Cohn—can bring a 10(b) action on its behalf, even if it is he who is alleged to have committed the fraud; plaintiffs, the intended beneficiaries of the purchase, have no recourse under section 10(b), either individually or derivatively.

■ The Second Circuit has not always interpreted the *Birnbaum* rule strictly in the context of shareholder derivative suits. The law in this Circuit is well-settled that a shareholder may bring a derivative 10(b) action on behalf of a defrauded corporation, even though it is the corporation, not the shareholder, that actually purchased or sold the shares.[6] *See Schoenbaum v. Firstbrook,* 405 F.2d 215, 219 (1968), *cert. denied,* 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219; *Ruckle v. Roto American Corp.,* 339 F.2d 24, 27–28 (1964). Extending the logic of that rule, the Second Circuit has upheld the standing of trust beneficiaries to pursue 10(b) claims against the fund trustee for fraudulently mismanaging the assets of fund. *See Kirshner v. United States,* 603 F.2d 234, 240 (2d Cir.1978), *cert. denied,* 442 U.S. 909, 99 S.Ct. 2821, 61 L.Ed.2d 274 (1977) and 444 U.S. 995, 100 S.Ct. 531, 62 L.Ed.2d 426 (1979). *See also Heyman v. Heyman,* 356 F.Supp. 958, 964 (S.D.N.Y.1973).

---

**6.** In approving the *Birnbaum* rule in *Blue Chip Stamps,* the Supreme Court took note of this exception. *See* 421 U.S. at 748–49, 95 S.Ct. at 1931–32.

Defendant would draw the line here, and cites *Benson v. RMJ Securities Corp.*, 683 F.Supp. 359 (S.D.N.Y.1988) for the proposition that will beneficiaries, unlike trust beneficiaries, do not have standing to bring a 10(b) claim against the legal representative of the estate.

The plaintiff in *Benson* was a residuary beneficiary of the estate of John McSharry, a shareholder of RMJ Securities Corporation ("RMJ"). Soon after McSharry's death, the Estate, through its executors, sold McSharry's shares to the corporation pursuant to the terms of a redemption clause in the shareholders' agreement. Plaintiff subsequently sued the corporation, several of its shareholders, and the Estate for securities fraud in connection with the redemption of McSharry's shares.[7] The court found that plaintiff lacked standing to bring a section 10(b) claim because the Estate, not plaintiff, had actually sold the shares. *See* 683 F.Supp. at 367. In so holding, the court explicitly refused to extend the rationale of *Kirshner* to will beneficiaries. *See id.* In the court's view, the Second Circuit's analogy in *Kirshner* between shareholder derivative standing and trust beneficiary standing makes sense because trusts, like corporations, have lives of extended duration, and trustees owe fiduciary duties to beneficiaries, just as corporate managers owe fiduciary duties to shareholders. *See id.* Based on these similarities, the court concluded that "it is reasonable ... that a trust beneficiary be able to challenge allegedly fraudulent transactions carried out by the trustee." *Id.* The administration of wills, on the other hand, "is meant to be of limited duration, the primary obligation of the administrator being to wind up the affairs of the estate and to carry out the wishes of the testator." *Id.* Relying on these differences between trusts and wills, the court denied the plaintiff standing to bring her 10(b) claim.

■ Defendant would have me apply the *Benson* rule strictly and deny plaintiffs standing to sue simply because they are will beneficiaries. However, three of the plaintiffs—Suzanne Lawrence, Richard Lawrence, and Marta Jo Lawrence—are beneficiaries

under the residuary trust created by the will, and their interests in the estate constitute the corpus of this trust. Under the doctrine of *Kirshner*, these plaintiffs undoubtedly have standing to attack alleged securities fraud perpetrated by the trustee, Seymour Cohn, in connection with the management of trust assets.

But even setting aside this fact, I find that all four plaintiffs have standing to sue as will beneficiaries. It is true, as defendant suggests, that the broad rule of *Benson* would seem to deny plaintiffs standing to sue in this capacity. However, I respectfully disagree with that decision, and hold that the derivative analogy of *Kirshner* should extend to will beneficiaries.

"The purchase-sale requirement must be interpreted so that the broad design of the Exchange Act, to prevent inequitable and unfair practices on securities exchanges and over-the-counter markets, is not frustrated by the use of novel or atypical transactions." *A.T. Brod & Co. v. Perlow*, 375 F.2d 393, 397 (2d Cir.1967). *See Superintendent of Insurance of New York v. Bankers Life and Casualty Co.*, 404 U.S. 6, 12, 92 S.Ct. 165, 168–69, 30 L.Ed.2d 128 (1971) ("Section 10(b) must be read flexibly, not technically and restrictively"). The rule allowing shareholders and trustees to sue their respective fiduciaries derivatively for violations of section 10(b) recognizes that the "broad design of the Exchange Act" would be undercut if the language of *Blue Chip Stamps* were applied literally to deny such standing. It is the shareholders and trustees who are, at bottom, hurt by a fiduciary's violation of 10(b). Yet, without standing, they cannot obtain the relief they deserve, since the individual responsible for pressing the claim on the corporation's or trust's behalf is an alleged fraudsman.

Will beneficiaries are faced with the same potential predicament. If an estate has a viable 10(b) claim, and the executor was a party to the fraud underlying the claim, the will beneficiaries must have standing to sue on the estate's behalf. Otherwise, the estate's 10(b) claim will never be brought. The

7. Plaintiff also appended to her federal claim several state law causes of action.

executor, quite plainly, cannot be expected to sue himself for the benefit of the Estate.

This case provides a perfect example of why such standing is warranted. The defendant here occupies a dual role: he is both executor of the Estate and the sole general partner of a partnership in which the Estate has a substantial stake. Assuming, as the complaint alleges, that defendant abused his dual role and defrauded the Estate in connection with the purchase or sale of a security, the beneficiaries have suffered a direct and tangible injury under section 10(b). To obtain redress, the beneficiaries need standing to sue, for Cohn, as executor, cannot be expected to bring a securities fraud claim against Cohn, as general partner.

The distinctions made in *Benson* between trusts and wills do not persuade me that will beneficiaries should be denied standing to pursue 10(b) claims against the estate executor. An executor owes fiduciary duties to will beneficiaries, just as a trustee owes such duties to trust beneficiaries. The fact that the executor must also give effect to the wishes of the testator does not in any way diminish his duties to the beneficiaries, nor does not set him apart from the trustee, who has an obligation to implement the wishes of the creator of the trust. I see no principled reason why the duration of the typical estate should affect the 10(b) standing of its beneficiaries. If, during the will's administration, the executor violates the Estate's rights under section 10(b), the estate—and *a fortiori* the beneficiaries—are entitled to a remedy, even if the executor's tenure will end soon.

The primary case cited by the *Benson* court in support of its holding—*Kerrigan v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 450 F.Supp. 639 (1978)—does not undermine my conclusion. In that case, the plaintiff, a will beneficiary, was denied standing to pursue a 10(b) claim on the Estate's behalf, but no fraudulent conduct was alleged on the part of the executor. In fact, the executor in that case was also a plaintiff. Therefore, the estate beneficiary did not find herself in the same predicament as plaintiffs here; she could rely on the executor to press the 10(b) claim on behalf of the Estate. In addition, it was the executor who had made the invest-

ment decision in that case, so that misrepresentations made to the beneficiary were immaterial. *See id.*

I recognize that not every fraud is meant to be remedied by the federal securities laws. However, once a violation of section 10(b) is sufficiently alleged, there must be someone to press that claim. If the legal representative of the estate (or trust or corporation) cannot realistically be expected to do so, then the true party in interest—namely, the beneficiary (or shareholder)—should be given that power.

I might also add that granting plaintiffs standing in these circumstances comports with the underlying purposes of section 10(b) and rule 10b–5. As the *Benson* court noted, those provisions exist to promote full and accurate disclosure of material information to buyers and sellers of securities. *See* 683 F.Supp. at 368. Although plaintiffs were not technically buyers or sellers, they were the ones who essentially negotiated the settlement agreement on behalf of the Estate; the executor was sitting on the opposite side of the bargaining table. The Agreement itself bears this out. Page 7 reads:

> The Beneficiaries hereby:
>
> (1) Request, and consent to, the purchase by Sylvan's Estate of one-half of the [Limited Partnership i]nterests for $5,000,000.
>
> (2) Consent to the payment by Sylvan's Estate to Seymour individually of interest in the amount of $298,871, being interest on $2,500,000 (one-half of the amount paid by Seymour individually on execution of the contract to purchase the [Limited Partnership i]nterests), as computed from the date of Seymour's payment of the $5,000,000 to May 23, 1984.

The complaint alleges that plaintiffs relied on defendant's misrepresentations in consenting to these provisions. Therefore, to deny them standing simply because they are not nominal sellers or buyers would be to exalt form over substance, and contravene the primary purpose of the statute and rule.

Accordingly, I hold that plaintiffs have standing to bring their claims under the federal securities laws.

**574**

### B. *The Preclusive Effect of the Consent Decree*

■ Defendant next asks that I dismiss the section 10(b) claim on issue preclusion grounds. According to defendant, the Estate's stake in the Limited Partnership interests has already been determined in the Surrogate's Court. The Estate entered into a settlement providing it with 50% of those interests, and the Surrogate endorsed this settlement, giving it the force of a court order. Thus, the argument goes, plaintiffs cannot "relitigate" in this Court issues resolved by that consent order, even if plaintiffs properly invoked section 10(b).

The issue, however, is not one of collateral estoppel. Plaintiffs do not ask this Court to reconsider issues resolved by the court-endorsed settlement. Instead, they claim that they were induced by fraudulent misrepresentations to enter into that settlement. That claim was not addressed by the Surrogate's Court, or any other court for that matter. Therefore, nothing in the Surrogate Court's order precludes me from considering plaintiff's 10(b) claim.

■ There is however a separate issue that demands attention: the ability of plaintiffs to seek relief in this Court for the the fraud they have alleged. In defendant's view, the full faith and credit doctrine of 28 U.S.C. § 1738 requires plaintiffs to move before the Surrogate to set aside her order, and forecloses a "collateral attack" in this Court. That view is directly at odds with the view of the Second Circuit in *Slotkin v. Citizens Cas. Co. of New York,* 614 F.2d 301, 312 (1979), *cert. denied,* 449 U.S. 981, 101 S.Ct. 395, 66 L.Ed.2d 243 (1980), which held that separate actions for fraud like the one at bar are cognizable under the laws of New York.[8]

Plaintiffs in *Slotkin* had originally settled a personal injury claim in state court, relying on representations made by defendants concerning the extent of their insurance coverage. After the parties read a stipulation of settlement into the record but prior to its approval by the court, plaintiffs learned that the defendants had understated the amount of their policy. Despite this discovery, plaintiffs urged the court to approve the settlement because of problems associated with retrying the case, a request the court granted. Plaintiffs then brought a diversity claim for common law fraud in federal district court, claiming that the defendants had fraudulently induced them to settle their prior lawsuit.[9] *See* 614 F.2d at 310.

The district court ultimately dismissed the complaint,[10] holding that the action was barred because plaintiffs had insisted on having the settlement approved after learning of the misrepresentations. *See id.* The Second Circuit disagreed, and stated that plaintiffs' choice to accept the settlement did not, under the circumstances, constitute a waiver of their right to sue for fraud. In coming to its conclusion, the Second Circuit explicitly recognized that plaintiffs had such a right to waive. The court stated: "[t]he law of New York is clear that one who has been induced by fraudulent misrepresentation to settle a claim may recover damages without rescinding the settlement." *Id.* at 312. This makes sense, said the court, because otherwise a fraudsman would have nothing to lose. The only consequence of a discovered fraud would be recission of the settlement and a new trial. *See id.*

■ The language of *Slotkin* is clear: under the law of New York, a settling party has the right to challenge a settlement in a separate action for fraud, and need not seek its

---

8. 28 U.S.C. § 1738 "directs a federal court to refer to the preclusion law of the State in which judgment was rendered." *Marrese v. American Academy of Ortho. Surgeons,* 470 U.S. 373, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985). Therefore, I consider defendant's argument in accordance with the laws of New York. To the extent that this is an issue of federal common law, the Sec-

ond Circuit noted its approval of the New York rule in *Slotkin.* *See* 614 F.2d at 312.

9. At the time the court approved the settlement, all parties to that settlement, as well as the court, knew of plaintiffs' intention to sue for fraud.

10. After the jury rendered a verdict for the plaintiffs, the Court granted defendants' motion for

recission in the court that approved it.[11] Defendant seeks to avoid *Slotkin* by pointing to an arcane distinction in New York law between "intrinsic" fraud and "extrinsic" fraud. A line of New York cases has held that a court should "set aside or annul a judgment at law on the ground of fraud only where the fraud is extrinsic or collateral to the matter tried in the original action, and not where the fraud was in the matter on which the judgment was rendered." *Tamimi v. Tamimi*, 38 A.D.2d 197, 328 N.Y.S.2d 477, 483 (1972). Fraud is "extrinsic ... when its effect is to prevent the unsuccessful party from having a trial or from presenting his case fully, as, for instance, keeping him away from court by false promise or compromise, or purposely keeping him in ignorance of the pendency of the action." *Id.* This doctrine is essentially designed to preserve the finality of litigated judgments, and prevent parties from challenging them when they are founded on perjured evidence. *See, e.g. Crouse v. McVickar*, 207 N.Y. 213, 217–19, 100 N.E. 697 (1912); *Tamimi* 328 N.Y.S.2d at 484.

This doctrine has no relevance to the instant case. Plaintiffs do not seek to set aside a litigated judgment based on fraudulent misrepresentations made at trial. Rather, they seek damages and equitable relief for fraud allegedly committed by defendant in negotiating a settlement. *Slotkin* expressly acknowledged the viability of such a cause of action under New York law, and I am obliged to follow that holding. Therefore, I reject defendant's full faith and credit argument.

## C. *Abstention*

■ Defendant asks me to abstain from exercising jurisdiction over the section 10(b) claim,[12] since the pending proceedings in the Surrogate's Court raise similar allegations of misconduct on the part of Seymour Cohn. However, federal courts have exclusive jurisdiction over 1934 Act claims, *see* 15 U.S.C.

§ 78aa, a fact that makes abstention as to plaintiff's section 10(b) claim improper. This is so, despite the existence of related state court proceedings. In the Second Circuit's words:

> [F]ederal courts must hear claims within their exclusive jurisdiction, for otherwise the right alleged would never be fully adjudicated. The ability to raise federal claims in state proceedings has always been a prerequisite to *Younger* abstention, and it is clear as well that abstention for purposes of judicial economy under *Colorado River* applies only where concurrent federal-state jurisdiction exists.

*Levy v. Lewis*, 635 F.2d 960, 967 (1980). *See also Finkielstain v. Seidel*, 857 F.2d 893, 896 (2d Cir.1988); *Andrea Theatres, Inc. v. Theatre Confections, Inc.*, 787 F.2d 59, 62 (2d Cir.1986). Were a federal court to abstain in these circumstances, the plaintiff would lack a forum in which to vindicate his federal statutory rights.

Defendant cites *Lorentzen v. Levolor Corp.*, 754 F.Supp. 987 (S.D.N.Y.1990), for the proposition that, in certain circumstances, abstention may be justified as to claims over which the federal courts have exclusive jurisdiction. "*Lorentzen*, however, is contrary to the prevailing view within this circuit which holds that the presence of a claim for which there is exclusive federal jurisdiction weighs heavily in favor of the exercise of federal jurisdiction." *Cohen v. Reed*, 868 F.Supp. 489, 500 (E.D.N.Y.1994). In any event, the *Lorentzen* case is distinguishable on its facts, fact which the court described as "peculiar." 754 F.Supp. at 994. The plaintiff there had originally chosen to pursue a common law fraud claim in state court, despite the availability of a section 10(b) claim which would have moved the case into federal court. One and a half years later, after the state court ruled adversely to the plaintiff on two separate occasions, the

---

judgment notwithstanding the verdict.

**11.** The fact that plaintiffs allege a federal fraud claim, as opposed to a common law fraud claim, does not alter the *Slotkin* analysis. In fact, if anything, it tilts the scales even more heavily in plaintiff's favor. Federal courts have exclusive jurisdiction over section 10(b) claims. *See* 15

U.S.C. § 78aa. Therefore, plaintiff could not rely on this provision if their only forum for relief were the Surrogate's Court.

**12.** Defendant requests either a stay or a complete dismissal on abstention grounds. The ensuing analysis applies equally to both requests.

plaintiff brought a 10(b) cause of action in federal court "premised on the exact same allegations of misconduct" as his common law fraud claim. The court viewed this as a blatant example of forum shopping: the plaintiff had simply cloaked his common law fraud claim in 10(b) terms in order to obtain a more favorable forum in which to present it. Thus, the court abstained and stayed the action, pending the outcome of the state court proceedings.

This case lacks the element of forum shopping present in the *Lorentzen* case. There is no state court action for fraud. Presently pending in the Surrogate's Court are actions for a compulsory final accounting, and for a disbursement of Estate funds. Both of these claims, which relate to the proper administration of the Estate, belong in the Surrogate's Court. In addition, neither of them parrot the pleadings here, which are designed to establish the existence of a 10(b) claim. At most, the actions are related, which, as the Second Circuit has made clear, is not enough to justify abstention. Therefore, I follow governing law in this circuit, and hold that abstention is inappropriate as to plaintiff's 10(b) claim.

### D. *Failure to State a Claim Under Section 10(b) and Rule 10b-5*

Having decided the threshold issues in plaintiff's favor, I now turn to defendant's arguments under Rule 12(b)(6).

On a motion to dismiss under Rule 12(b)(6), the trial court's function "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980); *see Ricciuti v. N.Y.C. Transit Authority,* 941 F.2d 119, 124 (2d Cir.1991). "[T]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). The district court should grant a Rule 12(b)(6) motion "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,*

467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984) (*citing Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957)). The motion to dismiss for failure to state a claim must be judged in accordance with the substantive law of civil suits based on violations of section 10(b) and rule 10b-5.

■ Defendant first argues that plaintiffs have failed to adequately allege loss causation, an essential element of a claim under section 10(b) and rule 10b-5. In defendant's view, plaintiff's allegation of economic loss is premised on the notion that the Estate possessed a right of first refusal over the purchase of the Limited Partnership interests, which it effectively relinquished in the settlement and order. Defendant contends that the Estate possessed no such right; that it was entitled to no more of the Limited Partnership interests than it received; and that therefore plaintiffs suffered no economic loss as a result of defendant's alleged misrepresentations.

In the amended complaint, plaintiffs quote directly from a provision in the Limited Partnership Agreement in alleging that every limited partner is vested with a right of first refusal over the sale of a limited partnership interest. *See* Complaint at ¶ 29, 30. Defendant contends that the terms of this provision are not so broad and that the right may be exercised only when a limited partner receives, without soliciting, an offer from someone outside the partnership. In making this argument, defendant places heavy emphasis on the following highlighted language:

> In the event that any one or more of the Limited Partners **shall receive and wish to accept** a bona fide offer for the purchase of his interest in the partnership (hereinafter called the *"Outside Offer"*) ... the other Limited Partners shall be privileged to purchase the interest of the Limited Partner on the same terms as the *Outside Offer....*

Complaint at ¶ 29. In defendant's view, the transaction in this case was not subject to the Estate's qualified right of first refusal, since the purchaser was Cohn, a general partner,

and the complaint does not allege that Cohn instigated the sale.

Contrary to defendant's assertion, the language above does not unmistakably restrict the right of first refusal to transactions initiated by the buyer rather than the seller. A limited partner can, in theory, "receive and wish to accept" an offer that he has solicited. Under defendant's interpretation, the offering limited partner could circumvent the right of first refusal simply by sending greeting cards to prospective buyers soliciting an offer. Since defendant's reading would yield this anomalous result, I cannot accept it for Rule 12(b)(6) purposes.

I am also unpersuaded that limited partners may only exercise their right of first refusal when the proposed purchaser is an outsider. The phrase "outside offer" is used simply as an abbreviation for the phrase "a bona fide offer for the purchase of [a limited partner's] interest in the partnership." Except for the use of the word "outside" in the abbreviation, I see nothing else in paragraph 8(b) to suggest that the offer must be made by nonpartner.

I am therefore unwilling to conclude as a matter of law that defendant's construction of the right of first refusal is correct. Plaintiffs have sufficiently alleged that the Estate, as a limited partner, possessed a right of first refusal over the purchase of the Limited Partnership interests.[13]

Defendant next argues that plaintiffs have failed to allege that any of the fraudulent misrepresentations were made in connection with: (1) the "purchase or sale" of (2) a "security." I disagree. Simply by stating that Cohn defrauded the Estate into purchasing one-half of the Limited Partnership interests, the complaint sufficiently alleges fraud in connection with the "purchase" of a "security." In addition, plaintiffs have sufficiently alleged that they "sold" a "security"—namely, their right of first refusal—and that they were induced to do so by defendant's fraudulent misrepresentations.

For a claim to lie under section 10(b) or rule 10b–5, the item purchased or sold must be a "security" within the meaning of the Exchange Act. "Security" is broadly defined in the Act to include several forms of investment instruments including: notes, stocks, bonds, options on securities, investment contracts, and any instrument commonly seen as a security. *See* 15 U.S.C. § 77b(1).[14] The Supreme Court has, on several occasions, been called upon to interpret the scope of the definition, particularly in regard to one of the listed instruments—"investment contracts." In *Securities Exchange Commission v. W.J. Howey Co.*, 328 U.S. 293, 298–99, 66 S.Ct. 1100, 1102–03, 90 L.Ed. 1244 (1946) defined "investment contract" as:

> a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party.

In this circuit and others, "a limited partnership interest generally is a security because such an interest involves investment 'in a common enterprise with profits to come solely from the efforts of others.'" *Mayer v. Oil Field Systems Corp.*, 721 F.2d 59, 65 (2d Cir.1983) (quoting *Howey*). *See SEC v. Holschuh*, 694 F.2d 130, 137 (7th Cir.1982); *SEC v. Murphy*, 626 F.2d 633, 640–41 (9th Cir. 1980). In the hands of the Estate, the Limited Partnership interests are no different. They represent stakes in a common enterprise, the profits of which (assuming there

---

**13.** Even if the Estate did not have a right of first refusal as to the Aron Group transaction, plaintiff still has alleged sufficient facts to infer loss causation. The 50% interest that the Estate received was procured through a settlement agreement. If defendant misrepresented the value of the Aron Group interests in settlement negotiations, that may have caused plaintiffs to negotiate less vigorously for a substantial portion of those interests.

**14.** "The term 'security' means any note, stock, treasury stock, bond, debenture, evidence of in-

debtedness, certificate of interest, or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a 'security,' or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing."

are any) are generated by Cohn, the general partner. The Estate is purely a passive investor. Therefore, the portion of the Limited Partnership interests purchased by the Estate is a security under section 10(b). *See Dooner v. NMI, Ltd.*, 725 F.Supp. 153, 158 (S.D.N.Y.1989) (holding that a limited partnership interest is a security, and that the presence of only one limited partner does not destroy the commonality requirement.)

Defendant resists this conclusion by pointing to two Fifth Circuit cases which stand for the proposition that a limited partnership interest in the hands of a general partner is not a security, because general partners possess managerial rights and do not rely on the efforts of others for profit. *See Siebel v. Scott*, 725 F.2d 995, 999 (1984), *cert. denied* 467 U.S. 1242, 104 S.Ct. 3515, 82 L.Ed.2d 823 (1984); *Frazier v. Manson*, 651 F.2d 1078, 1080 (1981). I do not quarrel with this rule. However, the Estate is not a general partner, and it is the Estate's purchase which is the subject of this suit. The stake that went to the Estate is a security, even if the other half went to Cohn, a general partner.

The Estate also "sold" a security in relinquishing its right of first refusal. The definition of security in the 1934 Act includes in its list an "option ... on any security." The Estate's right of first refusal is just that—an option to purchase a limited partnership interest. *See Lubin v. Belco Petroleum Corp.*, 1978 WL 1110, 3–4 (S.D.N.Y.1978) (holding that put-option on limited partnership interest is a security); *Green v. Hamilton Intern. Corp.*, 437 F.Supp. 723, 727 (S.D.N.Y.1977) (holder of contractual right to acquire stock entitled to Rule 10b–5 protection).

To be sure, the Estate did not technically "sell" its right of first refusal to Cohn. However, the definition of a "sale" in the 1934 Act is not so restrictive, and includes any "contract to ... dispose of" a security. As I have noted above, courts have been instructed to construe the purchase/sale requirement liberally so that the "broad design of the Exchange Act ... is not frustrated by the use of novel or atypical transactions." *A.T. Brod & Co.*, 375 F.2d at 397. *See also Superintendent of Insurance of New York*, 404 U.S. at 12, 92 S.Ct. at 168–69.

With these considerations in mind, I conclude that the settlement agreement constitutes a "contract to ... dispose of" a security. *Cf. Murphey v. Hillwood Villa Associates*, 411 F.Supp. 287, 292–93 (S.D.N.Y.1976) (forfeiture of limited partnership interests pursuant to a contract held to be "sale" of a security); *Lubin*, 1978 WL at **5 (surrender of put-option on limited partnership interest was a "sale" of a security). In that agreement, the beneficiaries contracted to release any claim that they might have to the entirety of the Limited Partnership interests. Specifically, it provides that the beneficiaries

> release any claim they might now or hereafter have that the Estate, in addition to the one-half it is purchasing, should have purchased part or all of the one-half purchased by Seymour individually.

Complaint at ¶ 69. The plaintiffs therefore surrendered their right of first refusal or, in 1934 Act terms, disposed of it by contract. The fact that plaintiffs did not receive consideration in return for this release does not make it any less of a sale. "Consideration need not be the *sine qua non* of a sale under Rule 10b–5." *Murphey*, 411 F.Supp. at 293 (S.D.N.Y.1976), citing *International Controls Corp. v. Vesco*, 490 F.2d 1334 (2d Cir.1974).

### V. *Motion to Dismiss the RICO and State Law Claims*

I now turn to the motion to dismiss plaintiff's RICO and state law claims. In my earlier opinion in this case, I decided to abstain from exercising jurisdiction over these claims. It is necessary to review that decision here, since I rely on portions of it in deciding once again to abstain.

The section of that opinion entitled "RICO claim" starts with a discussion of *Tafflin v. Levitt*, 493 U.S. 455, 110 S.Ct. 792, 107 L.Ed.2d 887 (1990), which held that state courts have concurrent jurisdiction to adjudicate RICO claims. Thus, unlike claims brought under section 10(b) of the 1934 Act, "the assertion of a RICO claim in federal court does not mandate federal adjudication if a recognized basis for abstention exists." *Lawrence*, 778 F.Supp. at 683. I found that three such bases existed in this case.

The *Younger* doctrine provided the first such basis for abstention. That doctrine "espouse[s] a strong federal policy against federal court interference with pending state judicial proceedings absent extraordinary circumstances." *Middlesex Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 431, 102 S.Ct. 2515, 2520–21, 73 L.Ed.2d 116 (1982). The principles of comity and federalism underlying that decision apply equally to state civil and criminal proceedings. *See Pennzoil Co. v. Texaco Inc.*, 481 U.S. 1, 11, 107 S.Ct. 1519, 1526, 95 L.Ed.2d 1 (1987).

In fleshing out the *Younger* doctrine, I found that the following two premises underlie it:

> The first premise ... [is] 'the basic doctrine of equity jurisprudence that court of equity should not act ... when the moving party has an adequate remedy at law.' The second premise of *Younger* is that an important state interest is involved. But *Pennzoil* gives that element an expanded reading. 'This Court repeatedly has recognized that the States have important interests in administering certain aspects of their judicial systems.'

778 F.Supp. at 684 (citations omitted). With these premises in mind, I held that abstention was appropriate under *Younger*. In the amended complaint, which has not changed since the date of my first opinion, plaintiffs demand the imposition of a constructive trust on the Limited Partnership interests held by Cohn. It is requested for each of plaintiffs' claims. If granted, this remedy would, like an injunction, "preempt the Surrogate's Court's effort to administer the Estate for which that court is responsible under state law." 778 F.Supp. at 685. Abstention was therefore appropriate with respect to each of the remaining claims.

Alternatively, I held that *Burford* abstention was proper. *Burford* warrants abstention when federal jurisdiction, "would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *Colorado River*, 424 U.S. at 814, 96 S.Ct. at 1245 (citing *Burford v. Sun Oil*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943)). This doctrine applied to plaintiff's RICO and state law claims: issues raised by the state claims were already being litigated in the Surrogate's Court, and under *Tafflin*, plaintiff could also raise the RICO claim in that forum. "To superimpose the jurisdiction of this Court upon the Surrogate's Court would needlessly interfere with the state's administration of its own affairs in an area where the Surrogate's Court has particular expertise." 778 F.Supp. at 685 (internal quotation marks omitted).

Finally, the "exceptional circumstances" test of *Colorado River* justified abstention. Under *Colorado River* and its progeny, courts must consider the following six factors in deciding whether exceptional circumstances exist which warrant abstention: (1) whether the state court has assumed jurisdiction over specific property; (2) the convenience of the federal forum; (3) avoidance of piecemeal litigation; (4) the order in which the state and federal courts obtained jurisdiction; (5) whether state or federal law provides the rule of decision; and (6) the state court's ability to protect the claimant's federal rights. *See De Cisneros v. Younger*, 871 F.2d 305, 307 (2d Cir.1989). I found that each of these factors, with the exception of the second, militated in favor of abstention. Specifically, I stated:

> The Surrogate's Court has assumed jurisdiction over the *res* represented by the Estate; consolidation of all litigation in one court will obviously avoid piecemeal litigation; and the Surrogate's Court first obtained jurisdiction. The second factor ... does not arise, since the two courthouses face each other across Pearl Street. As for the fifth factor, ... on balance it favors abstention as well. Concurrent jurisdiction exists over all RICO claims, and the pendent claims all turn upon the substantive law of New York. Given the *Tafflin* decision, it is also apparent that plaintiff's federal rights derived from RICO will be protected by the state court proceeding. . . .

778 F.Supp. at 685–86. On balance, then, consideration of the six factors justified abstention under *Colorado River*.

This prior opinion was, as I have said, vacated in a subsequent memorandum opin-

ion and order. The vacatur was necessitated by a change in the limitations period applicable to section 10(b) claims. Although I was obligated to vacate that entire opinion based on the terms of the limited Second Circuit remand, nothing in the vacatur order affected the abstention analysis of that opinion, which applied only to plaintiff's RICO and state law claims.

Defendant, however, seizes the present opportunity to ask me to reconsider my legal analysis in that portion of the opinion. I think that my reasoning at the time was sound, and adhere to it. Nevertheless, a question remains as to whether the posture of the case or the law has changed so that abstention is no longer appropriate.

With respect to the posture of the case, the complaint has not been amended since the date of my first opinion, nor have any of the then-pending Surrogate's Court proceedings been resolved. The one aspect of the case that has changed since then is the viability of plaintiff's section 10(b) claim. In the first opinion, the abstention analysis followed a discussion dismissing plaintiffs' securities fraud claim. Here, that same claim has withstood a renewed motion to dismiss. The issue, then, is whether the presence of the 10(b) cause of action alters my decision to abstain as to the RICO and state law claims.

■ As an initial matter, I note that if a complaint contains claims that are subject to exclusive federal court jurisdiction and claims that can be heard in either state or federal court, the federal court may, if a recognized basis exists, abstain from hearing the latter claims, despite its obligation to exert jurisdiction over the former. This is precisely what the Second Circuit held in *Levy v. Lewis, supra.* There, the plaintiff had brought two claims under ERISA, the second of which could only be pursued in federal court. The court of appeals held that abstention was appropriate as to the first claim, but declined to abstain from considering the second because it "carrie[d] with it exclusive federal court jurisdiction." 635 F.2d at 967.

Having said this, I must decide whether such "selective abstention" is appropriate in the circumstances of this case. I find that it is, but no longer rely on the "exceptional circumstances" doctrine of *Colorado River* to support my conclusion.

With the addition of the 10(b) claim, the fifth factor in the *Colorado River* analysis— whether state or federal law provides the rule of decision—no longer militates in favor of abstention as to plaintiffs' RICO and state law claims. There are now two complex federal claims in the case; at most, then, factor five is neutral. Furthermore, the third factor—the avoidance of piecemeal litigation—now militates against abstention. The 10(b) claim must, as I have held, be heard in this Court. Thus, abstention as to the RICO and state law claims would create, rather than prevent, piecemeal litigation.

Given the Supreme Court's admonition to "careful[ly] balanc[e] ... the important factors as they apply in a given case, with the balance heavily weighted in favor of the exercise of jurisdiction," *Moses H. Cone Hospital v. Mercury Constr. Corp.*, 460 U.S. 1, 16, 103 S.Ct. 927, 936, 74 L.Ed.2d 765 (1983), I no longer think *Colorado River* abstention is appropriate. This conclusion comports with the principles underlying the *Colorado River* doctrine, which "rest on considerations of wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation." *Colorado River* at 817, 96 S.Ct. at 1246 (internal quotation marks and citation omitted). To abstain from exercising jurisdiction over the RICO and state law claims would run counter to these considerations.

■ The *Younger* and *Burford* abstention doctrines, however, do not rest on these same principles. Both doctrines are founded on considerations of comity and federalism. *See Youell v. Exxon Corp.*, 48 F.3d 105, 108 (2d Cir.1995) ("*Burford,* and *Younger* extricate the federal courts from situations where the assertion of jurisdiction would intrude into the state courts' proper domain."). The *Burford* doctrine reflects a "concern with [the] noninterruption of state administrative programs," *Levy* at 963, and the *Younger* doctrine expresses a parallel, "strong policy against federal intervention in state judicial processes...." *Moore v. Sims*, 442 U.S. 415, 423, 99 S.Ct. 2371, 2377, 60 L.Ed.2d 994

(1979). These considerations convinced me to abstain from exercising jurisdiction over the RICO and state law claims in my first opinion. The renewed viability of plaintiffs' 10(b) claim does not affect that analysis. As far as *Younger* abstention is concerned, the complaint still demands a constructive trust over the limited partnership interests held by Cohn in connection with each claim. Imposing such a trust would restrain the Surrogate's pending efforts to administer the Estate. With respect to *Burford,* issues raised by the state claims are still pending in the Surrogate's Court and, under *Tafflin,* the RICO claim can be presented there. It is therefore once again necessary to abstain so as to avoid "needlessly interfer[ing] with the state's administration of its own affairs in an area where the Surrogate's Court has particular expertise." 778 F.Supp. at 685 (internal quotation marks omitted).

I acknowledge that the section 10(b) claim presents many of the same problems as plaintiffs' RICO and state law claims.[15] However, under clear Second Circuit authority, I am precluded from abstaining as to that claim. It is a claim over which this Court has exclusive jurisdiction, and plaintiffs are entitled to have it heard.

In a final effort to convince me not to abstain, plaintiffs contend that the law of abstention has changed since the date of my first opinion. Specifically, plaintiffs direct my attention to *Ankenbrandt v. Richards,* 504 U.S. 689, 112 S.Ct. 2206, 119 L.Ed.2d 468 (1992). The primary focus of that case was on the domestic relations exception to diversity jurisdiction. The Court upheld the exception, but found that it "encompasses only cases involving the issuance of a divorce, alimony, or child custody decree." 504 U.S. at 704, 112 S.Ct. at 2215. Since the action before it was not such a case, the Court found that the Fifth Circuit had erred in affirming the district court's ruling to decline jurisdiction. *See id.*

The Fifth Circuit and the district court had alternatively relied on the *Younger* doctrine in dismissing the case. The Supreme Court reversed on this point as well, finding that abstention under *Younger* was improper because there was no allegation of a pending state court proceeding. *See id.* at 705, 112 S.Ct. at 2215–16. In dicta, the Court recognized that *Burford* abstention could be applicable in the domestic relations context, but that it was inappropriate in the case at bar because the underlying suit did not present "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case at bar." *Id.* at 705–06, 112 S.Ct. at 2216 (citing and quoting *Colorado River* at 814, 96 S.Ct. at 1244–45) (internal quotation marks omitted).

Nothing in *Ankenbrandt* disturbs the reasoning in my prior opinion. There was, and presently is, a pending state court proceeding in this case, a necessary prerequisite to *Younger* abstention that was lacking in *Ankenbrandt.* As to *Burford* abstention, *Ankenbrandt* does not preclude its application to domestic disputes or, to adopt plaintiffs' analogy, to probate disputes. Therefore, I am free to adhere to my prior finding that the *Burford* doctrine applies to plaintiffs' RICO and state law claims.

There being no other new cases or considerations that would compel me to reassess the abstention analysis in my prior opinion, I adhere to that ruling and abstain from exercising jurisdiction over the RICO and state law claims.[16] Accordingly, defendant's motion to dismiss these claims is granted.

## VI.  *Conclusion*

For the reasons stated herein, I deny defendant's motion to dismiss the section 10(b)/rule 10b–5 claim, but abstain from exer-

---

**15.** For example, plaintiffs request a constructive trust in connection with this claim as well.

**16.** In coming to this conclusion, I realize that one of the predicate offenses underlying the RICO claim is securities fraud. Although the securities fraud claim itself must be filed in fed-

eral court, *Tafflin* would seem to allow a plaintiff to bring a RICO claim based on a securities fraud predicate offense in state court. *See* 1 Civil RICO Litigation § 3.04[A][3] at 3–98 (2d Ed.1992).

cising jurisdiction over the RICO and state law claims.

It is SO ORDERED.